# 23-46-PR

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

▸▸◂◂

SEAN BAKER,

*Petitioner-Appellant,*

*v.*

JAMES CONWAY,

*Respondent-Appellee.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR PETITIONER-APPELLANT

Kyle Victor
HANGLEY ARONCHICK SEGAL
  PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
215-568-6200

Amelia T.R. Starr
Yona A. Kornsgold
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

David Bernstein
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, New York 10007
212-402-4141

*Attorneys for Petitioner-Appellant*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUE......................................................................2

STATEMENT OF THE CASE........................................................................3

    State Court Trial Proceedings ..............................................................5

    Sentencing Proceedings ....................................................................10

    State Court Post-Conviction Proceedings .........................................18

    Federal Habeas Corpus Proceedings.................................................21

SUMMARY OF ARGUMENT ....................................................................23

ARGUMENT ...............................................................................................25

I.      STANDARD OF REVIEW ..............................................................26

II.    MR. BRUNO'S ABANDONMENT OF MR. BAKER AT
       SENTENCING CONSTITUTED DEFICIENT PERFORMANCE
       UNDER THE SIXTH AMENDMENT STANDARD. .................................27

III.   PREJUDICE TO MR. BAKER IS PRESUMED, OR, IN THE
       ALTERNATIVE, IS READILY DEMONSTRATED. ................................37

       A.    Because Mr. Bruno Failed to Subject the State's Case to
            Meaningful Adversarial Testing, This Court Should Presume
            Prejudice Under *United States v. Cronic*. ...........................37

       B.    Even If *Cronic* Does Not Apply, *Strickland* Prejudice to Mr.
            Baker Is Easily Demonstrated. .............................................45

CONCLUSION ............................................................................................54

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................55

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Anders v. California*,
386 U.S. 738 (1967)..............................................................................25

*Bell v. Cone*,
535 U.S. 685 (2002)..............................................................28, 38, 39, 44

*Bell v. Miller*,
500 F.3d 149 (2d Cir. 2007) ...............................................................34

*Correll v. Ryan*,
539 F.3d 938 (9th Cir. 2008) ..............................................................35

*Florida v. Nixon*,
543 U.S. 175 (2004)...............................................................................35

*Francis S. v. Stone*,
221 F.3d 100 (2d Cir. 2000) ...............................................................45

*Gardiner v. United States*,
679 F. Supp 1143 (D. Me. 1988) ...........................................28, 33, 41

*Garvey v. Duncan*,
485 F.3d 709 (2d Cir. 2007) ...............................................................35

*Garza v. Idaho*,
139 S. Ct. 738 (2019)............................................................................38

*Glover v. United States*,
531 U.S. 198 (2001)........................................................................31, 51

*Gonzalez v. United States*,
722 F.3d 118 (2d Cir. 2013) ......................................................*passim*

*Lafler v. Cooper*,
566 U.S. 156 (2012)................................................................31, 39, 52

*Lewis v. Zatecky*,
993 F.3d 994 (7th Cir. 2021), *cert. denied sub nom.*
*Reagle v. Lewis*, 142 S. Ct. 897 (2022) ........................................*passim*

*McLean v. United States*,
No. 08-cr-789 (RJS), 2016 WL 3910664 (S.D.N.Y. July 13, 2016)................41

*Mempa v. Rhay*,
389 U.S. 128 (1967)........................................................31, 39, 52

*Miller v. Martin*,
481 F.3d 468 (7th Cir. 2007) ........................................*passim*

*Miranda v. Arizona*,
384 U.S. 436 (1966)........................................................47

*Norde v. Keane*,
294 F.3d 401 (2d Cir. 2002) ........................................40

*Patrasso v. Nelson*,
121 F.3d 297 (7th Cir. 1997) ........................................28, 34, 37, 40

*People v. Carter*,
200 A.D.3d 1719 (4th Dep't 2021)........................................36

*People v. Devone C.*,
161 A.D.3d 648 (1st Dep't 2018) ........................................48

*People v. Farrar*,
52 N.Y.2d 302 (N.Y. 1981) ........................................49

*People v. Kerringer*,
195 A.D.3d 861 (2d Dep't 2021)........................................46

*People v. Matias*,
205 A.D.3d 557 (1st Dep't 2022) ........................................30

*People v. McClain*,
35 N.Y.2d 483 (1974) ........................................47

*People v. Vega*,
73 A.D.3d 1218 (2d Dep't 2010)........................................36

*People v. Watt*,
189 A.D.3d 637 (1st Dep't 2020) ........................................................49

*People v. Wilt*,
18 A.D.3d 971 (3d Dep't 2005) ...........................................................30

*Phillips v. White*,
851 F.3d 567 (6th Cir. 2017) ...............................................................40

*Powell v. Alabama*,
287 U.S. 45 (1932)...............................................................................44

*Strickland v. Washington*,
466 U.S. 668 (1984).......................................................................*passim*

*Tavarez v. Larkin*,
814 F.3d 644 (2d Cir. 2016) ................................................................26

*Thompson v. Oklahoma*,
487 U.S. 815 (1998).............................................................................49

*Tucker v. Day*,
969 F.2d 155 (5th Cir. 1992) .........................................................40, 42

*United States v. Collins*,
430 F.3d 1260 (10th Cir. 2005) ...........................................................41

*United States v. Cronic*,
466 U.S. 648 (1984).......................................................................*passim*

*United States v. Daniels*,
558 F.2d 122 (2d Cir. 1977) ................................................................28

*United States v. Detloff*,
No.13-20298, 2017 WL 1151072 (E.D. Mich. Mar. 28, 2017)...........40

*United States v. Gooding*,
594 Fed. App'x 123 (4th Cir. 2014) .....................................................33

*United States v. Hill*,
No. 3:07-cr-407, 2013 WL 3816741 (E.D. Va. July 22, 2013)......28, 41

*Waiters v. Lee*,
857 F.3d 466 (2d Cir. 2017) ...............................................................26

*Wilson v. Sellers*,
138 S. Ct. 1188 (2018) .......................................................................26

**Statutes**

28 U.S.C. § 2253(c) .......................................................................1, 22

28 U.S.C. § 2254 ......................................................................*passim*

N.Y. Crim. Pro. § 440.10 ......................................................................18

N.Y. Crim. Pro. § 722.21(5) ..................................................................48

N.Y. Penal Law § 1.05(4) ......................................................................48

N.Y. Penal Law § 70.00(2)–(3) .............................................................15

N.Y. Penal Law § 70.02(4)(b)(ii).........................................................48

N.Y. Penal Law § 70.25(2-b) .................................................................48

N.Y. Penal Law § 125.25(3) ..............................................................6, 15

**Rules**

N.Y. C.P.L. § 440.10.......................................................................1, 2, 19

Fed. R. App. P. 4(a)(1)(A) ......................................................................1

Fed. R. App. P. 22(b) ............................................................................22

**Constitutional Provisions**

U.S. Const. Amendment VI .............................................................*passim*

# JURISDICTIONAL STATEMENT

Petitioner-Appellant Sean Baker, currently in New York State custody, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition, a petition which Mr. Baker filed after he unsuccessfully sought post-conviction relief in New York state court under N.Y. C.P.L. § 440.10, and after exhausting his state-court appeals. The district court had subject matter jurisdiction under 28 U.S.C. § 2254(b). This Court has appellate jurisdiction under 28 U.S.C. § 2253(c).

The district court issued an Opinion and Order denying Mr. Baker's petition in its entirety on December 13, 2022. S.A. 35.[1] That decision was a final order that disposed of all of Mr. Baker's claims. Mr. Baker filed a timely notice of appeal on January 9, 2023. J.A. 907; Fed. R. App. P. 4(a)(1)(A). On January 12, 2023, Mr. Baker moved this Court for a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A). On April 20, 2023, this Court issued an Order granting in part Mr. Baker's motion for a certificate of appealability.

---

[1] S.A. citations refer to the Special Appendix. J.A. citations refer to the parties' Joint Appendix.

## STATEMENT OF THE ISSUE

Whether the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Cronic*, 466 U.S. 648 (1984), in denying Sean Baker's motion for post-conviction relief pursuant to N.Y. C.P.L. § 440.10 on the ground of ineffective assistance of counsel at sentencing, and whether the district court erred in denying Mr. Baker's petition for habeas corpus relief pursuant to 28 U.S.C. § 2254.

## STATEMENT OF THE CASE

This case is about a lawyer abandoning his client. At a critical stage of Sean Baker's criminal proceeding—his sentencing—he received no assistance from his lawyer. None.

Ill-advised and barely of age, Mr. Baker chose to stand trial on a felony-murder charge rather than accept a fourteen-year plea bargain offered by the Bronx County prosecutor. Following his conviction, Mr. Baker desperately needed a competent attorney to advocate on his behalf at his sentencing hearing. He needed an attorney who would explain to the sentencing judge that Mr. Baker had played a limited role in the underlying offense and bore no direct responsibility for the victim's tragic death. He needed able counsel to tell the story of Mr. Baker's difficult upbringing, to express his deep remorse, and to correct inflammatory errors in the pre-sentence report (the "PSR"). He needed an advocate who would explain to the judge that all of these factors counseled in favor of a lenient sentence. But instead of having competent representation to express these arguments, he had his court-appointed lawyer, Patrick Bruno, who remained silent, except to say:

> Your Honor, there is nothing I could add [to the prosecutor's statement]. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time.

J.A. 652 (Sentencing Tr. 5:8–11).

In the absence of any advocacy on Mr. Baker's behalf, the trial judge imposed an indeterminate sentence of twenty years to life in prison, a sentence substantially greater than the statutory minimum sentence of fifteen years to life.

This unjust outcome could easily have been avoided. Mr. Bruno's abandonment of his client at sentencing was not an isolated incident, but rather the final iteration of a pattern of ineffectiveness that had plagued his representation of Mr. Baker. Indeed, over a year before his trial, Mr. Baker notified the trial court of the deficient representation he was receiving from Mr. Bruno, as demonstrated by Mr. Bruno's failure to communicate with his young client apart from a single video conference around the time of Mr. Bruno's appointment. But rather than hear Mr. Baker's complaints about Mr. Bruno, and appoint new, suitable counsel, the trial court did nothing. In fact, the court never acknowledged—let alone addressed—the motion for a new attorney that Mr. Baker filed. It abdicated its duty to ensure that Mr. Baker received his constitutional right to the effective assistance of counsel.

That omission set in motion the chain of events that leads directly to Mr. Baker's continued incarceration today. Throughout the criminal proceeding, but particularly at sentencing, Mr. Baker received counsel in name only. The Constitution demands more. *See Strickland v. Washington*, 466 U.S. 668 (1984). This Court should therefore vacate Mr. Baker's sentence pursuant to 28 U.S.C.

§ 2254 and remand the case to the state court for resentencing with the benefit of competent representation.

State Court Trial Proceedings

Mr. Baker's conviction stems from the death of Ramiro Ramos Luna. In the early morning hours of October 6, 2007, three young men approached Mr. Luna as he exited from a restaurant in the Bronx. S.A. 2. Eyewitness testimony at Mr. Baker's trial established that one of those men was Mr. Baker. *Id.* The other two were Michael Allick and Kareem Warner. *Id.* Messrs. Allick and Warner proceeded to hold Mr. Luna against a wall. Two eyewitnesses testified at trial that Mr. Baker then removed items from Mr. Luna's pockets.[2] *Id.* Per eyewitness testimony and video surveillance footage, the three men then dragged Mr. Luna toward a flight of stairs, at which point Mr. Allick—not Mr. Baker—pushed Mr. Luna down the stairs. *Id.* During the fall, Mr. Luna sustained injuries from which he tragically died. *Id.*

The crucial fact bears repeating: Mr. Baker, who was only a seventeen-year-old adolescent at the time of the offense, did not push Mr. Luna down the flight of

---

[2] The district court apparently credited this testimony, but it bears noting that this characterization of Mr. Baker's role in the offense is contradicted by Mr. Warner's plea allocution, in which Mr. Warner stated that it was he, not Mr. Baker, who took property, including money, from the victim. J.A. 537 (Trial Tr. 384:15–22). Additionally, through an affidavit attached to his habeas petition, Mr. Baker maintains that he did not take money or property from Mr. Luna. J.A. 339.

stairs.[3] That fact, recounted in the district court's decision, is not in dispute. S.A. 2. Eyewitness testimony established that Mr. Allick, not Mr. Baker, was directly responsible for Mr. Luna's death. *Id.* However, by operation of New York's felony-murder rule, which incorporates the principal of accessorial liability, *see* N.Y. Penal Law § 125.25(3), Mr. Baker was charged with second-degree murder under Indictment Number 770/08.

Mr. Baker was arrested on March 4, 2008, J.A. 321, and attorney Patrick Bruno was appointed to represent him shortly thereafter, S.A. 3. However, Mr. Bruno's representation quickly proved inadequate, as Mr. Bruno made no efforts to visit Mr. Baker or to keep him apprised of the status of his proceeding. In November 2008, after approximately eight months of pre-trial incarceration, Mr. Baker mailed the court and the Bronx County District Attorney's office a pro se motion for reassignment of counsel. S.A. 3. Mr. Baker's motion alleged that Bruno had failed to "[v]isit [Mr. Baker] at his place of confinement," "[i]nform [Mr. Baker] of any pertinent motion made," "[c]onduct an investigation in the matter of this action on [Mr. Baker's] behalf," and "[m]ake any bail requests or reduction application on [Mr. Baker's] behalf," among other failings. *Id.* But the trial court never ruled on or

---

[3] The pre-sentence report prepared by the New York City Department of Probation indicates that Mr. Baker's date of birth is March 19, 1990. J.A. 321. The offense occurred, as noted, on October 6, 2007.

otherwise addressed this motion. *Id.* Mr. Baker, an indigent teenage defendant with no knowledge of legal procedure—and certainly no counsel to aid him in his attempts to secure a competent lawyer—assumed, as any person in his position would, that the court had denied the motion. J.A. 336.

Mr. Bruno's deficient representation also concerned Mr. Baker's mother, Lucinda Lewis, who remained involved with and supportive of her son throughout his criminal case. Prior to trial, Mr. Bruno never contacted Ms. Lewis to discuss Mr. Baker's case, the sentence he might face, or his background and personal history. J.A. 343. Ms. Lewis telephoned Mr. Bruno on numerous occasions prior to trial to speak with him about the case, but Mr. Bruno never took her calls, nor did he ever return her calls despite Ms. Lewis leaving multiple messages with Mr. Bruno's secretary. *Id.* Ms. Lewis attended most of Mr. Baker's court hearings and trial; but despite being in the same room as Mr. Bruno on multiple occasions, Mr. Bruno spoke only once with Ms. Lewis about Mr. Baker's case, and even then, only for two or three minutes. J.A. 343–44. Ms. Lewis became so concerned about the quality of Mr. Bruno's representation that she attempted to hire another attorney to represent Mr. Baker, but she could not afford that attorney's retainer. J.A. 345.

Mr. Baker's and Ms. Lewis's concerns about Mr. Bruno's representation proved justified. Following a single video conference shortly after his appointment in 2008, Mr. Bruno did not speak to Mr. Baker again outside of his brief court

appearances until January 2010, when the two spoke for about thirty minutes before a court hearing. J.A. 335. Mr. Baker called Mr. Bruno at least five times prior to trial, but Mr. Bruno was never available to speak to him. *Id*. According to Mr. Baker, Mr. Bruno never discussed the strong evidence against him or his slim chances at trial. J.A. 335–36. Mr. Bruno never explained the significance of the felony-murder rule to Mr. Baker, nor the fact that Mr. Baker was facing a potential life sentence if convicted. J.A. 334. Moreover, Mr. Bruno never shared discovery materials provided by the prosecutor, despite Mr. Baker's requests that he do so. J.A. 335.

In January 2010, during a court hearing, the District Attorney's Office offered Mr. Baker the chance to plead guilty to a charge of manslaughter in exchange for a determinate fourteen-year sentence of incarceration, to be followed by five years of post-release supervision. S.A. 4. In response, Mr. Bruno informed the trial court that Mr. Baker was rejecting the offer. *Id.* However, Mr. Baker later affirmed in an affidavit that Mr. Bruno had not previously informed Mr. Baker of this offer, and that Mr. Bruno neglected to ask the trial court for adequate time to discuss the offer with Mr. Baker.[4] Had he adequately understood the plea deal, and the consequences

---

[4] Mr. Bruno claimed that he had properly advised Mr. Baker regarding the plea offer, the felony murder rule, and his potential sentencing exposure at trial. Mr. Bruno claimed that he had advised Mr. Baker to accept the plea, but that Mr. Baker was adamantly opposed. S.A. 19–20. The district court credited Mr. Bruno's version of events. *Id.*

of a conviction after trial, Mr. Baker would have accepted the plea offer. J.A. 338. Mr. Bruno similarly failed to inform Mr. Baker's mother of the plea offer and the sentencing exposure that her son faced if convicted at trial; had she understood the terms of the offer and the stakes of turning it down, Ms. Lewis would have advised her son to accept the plea deal. J.A. 344.

Without effective assistance of counsel at the plea-bargaining stage, Mr. Baker proceeded to a jury trial, which began on April 14, 2010 and lasted six days. As Mr. Bruno knew or should have known, but failed to discuss with his client, the evidence of Mr. Baker's guilt was strong. The trial centered on the testimony of the two eyewitnesses who identified Mr. Baker, Mr. Allick, and Mr. Warner as the men who mugged Mr. Luna in the early morning hours on October 6, 2007. Importantly, both eyewitnesses testified unambiguously that it was Mr. Allick, not Mr. Baker, who pushed the victim, Mr. Luna, to his death. S.A. 2. But because one can be guilty of New York felony murder without directly causing the victim's death, the jury nevertheless convicted Mr. Baker of second-degree murder.[5] S.A. 5.

---

[5] Mr. Baker was tried alongside Mr. Allick. Mr. Allick was convicted of second-degree murder and sentenced to an indeterminate term of twenty-five years to life in prison. Mr. Warner had previously pled guilty to first-degree robbery. He received a sentence of eight years of imprisonment to be followed by five years of post-release supervision. S.A. 5 n.9.

Following Mr. Baker's conviction, the trial court held Mr. Baker's sentencing hearing on May 12, 2010. J.A. 651–52. But even before the hearing, Mr. Bruno had effectively abandoned his client. In the days and weeks prior to the hearing, Mr. Bruno made no effort to conduct an investigation into mitigating facts and circumstances that could have been presented at sentencing. Indeed, Mr. Bruno did not speak to Mr. Baker at all from the time of his conviction until they appeared in court together at the sentencing hearing. J.A. 339–40. Nor did Mr. Bruno ever speak to Mr. Baker's mother or any other members of the family to learn facts about Mr. Baker's background and childhood. J.A. 345.[6] Mr. Bruno accordingly remained unaware of significant mitigating facts.[7]

Had Mr. Bruno conducted even a minimal investigation, he would have learned that Mr. Baker, though just seventeen years old at the time of the offense, had already accumulated a lifetime of tragedy and hardship. Mr. Baker grew up without economic security, raised for most of his childhood by a single mother who worked nights in order to support her seven children. J.A. 345–46. Mr. Baker's father

---

[6] In the record below, Mr. Bruno did not dispute that he had failed to conduct such an investigation, except to note that he spoke to Mr. Baker prior to sentencing in order to work out a plea deal to an unrelated robbery offense. J.A. 221–22, 291.

[7] That a few such facts are identified in the PSR, as discussed below, serves only to demonstrate that Mr. Bruno should have been on notice of the need to conduct a full investigation into mitigating circumstances.

had a history of substance abuse and physical violence. J.A. 345. He was largely absent during Mr. Baker's childhood. *Id.* When he was present, he hit Mr. Baker and his siblings on numerous occasions and subjected them to psychological abuse. *Id.* Mr. Baker's father ultimately left the family when Mr. Baker was twelve years old, and thereafter had very little contact with Mr. Baker and provided no financial support. *Id.*

During Mr. Baker's childhood, his family spent time in various shelters, moving frequently, and forcing Mr. Baker to change schools approximately ten times before the ninth grade. J.A. 346. At approximately age five, Mr. Baker was placed with a foster family due to allegations that his mother had burned Mr. Baker's sister with cigarette butts. *Id.* Mr. Baker spent approximately two years in foster care, residing with at least three different families, one of whom physically abused Mr. Baker and forced him to sleep in a bug-infested pantry. *Id.* As a result of this mistreatment, Mr. Baker suffered from multiple serious bug bites that resulted in permanent scarring. *Id.*

After being returned to his mother's custody at approximately age seven, Mr. Baker increasingly exhibited signs of fear, anxiety, and aggression. *Id.* Mr. Baker attended counseling to deal with these issues, but the cumulative stresses of the obstacles recounted above—and particularly his father's departure from the family—began to impact Mr. Baker's performance at school. J.A. 346–47. Though

previously a good student, during the 2002-2003 school year, Mr. Baker accumulated thirty-three absences and forty-three tardy arrivals due primarily to his family's unstable housing situation at the time. *Id.* As a result of his attendance problems, Mr. Baker was denied entry to the school and was only re-enrolled after his mother contacted the school district. J.A. 347. The following year, Mr. Baker was discharged from Graphic Arts High School in Manhattan due to continuing attendance issues. *Id.* His mother recounts that Mr. Baker felt as though he did not fit in at school, because he was living in a domestic violence shelter at the time and lacked the stable home life and financial resources that other students had. *Id.*

Beyond his failure to uncover these readily ascertainable facts, Mr. Bruno also neglected to share a copy of Mr. Baker's PSR with him. J.A. 340. As a result, Mr. Bruno apparently remained unaware that the PSR contains obvious and prejudicial errors that Mr. Baker could have corrected had he seen a copy. Most egregiously, the PSR states in two places that Mr. Baker "caused the death of Ramiro Ramos-Luna, by throwing him down a flight of stairs," J.A. 322, 325, despite uncontroverted testimony at trial that Mr. Allick, and not Mr. Baker, pushed Mr. Luna down the stairs, S.A. 2. In addition, the PSR inexplicably states that Mr. Baker was a member of The Bloods gang, J.A. 323, even though Mr. Baker is not, and never has been, a member of any gang. J.A. 340.

Moreover, although the PSR notes some of the mitigating facts relating to Mr. Baker's upbringing and family circumstances, it does so in an incomplete and misleading manner. Specifically, the PSR notes that Mr. Baker's parents divorced, and that "[h]is father has provided no financial or moral support." J.A. 324. It further notes that Mr. Baker "and his family resided in various shelters" for a time and that he was discharged from school during the 11th grade due to poor attendance. *Id.* However, the PSR erroneously states that Mr. Baker "was raised . . . in a moderately stable home environment." J.A. 325. It omits any mention of Mr. Baker's experience in foster care and his childhood mental health struggles (only mentioning that he was diagnosed with depression while incarcerated). Had Mr. Baker seen a copy of the PSR before sentencing, he could have provided Mr. Bruno with a more complete picture. Furthermore, notwithstanding the trial court's invitation for the parties to file sentencing memoranda, J.A. 650 (Trial. Tr. 404:14–16), Mr. Bruno did make any sentencing submissions. *See* S.A. 5 n.10.

Next, at the sentencing hearing itself, Mr. Bruno continued his pattern of neglect by declining to make any presentation on Mr. Baker's behalf whatsoever, thus leaving the prosecutor's presentation uncontested. At the outset of the sentencing hearing, the prosecutor asked the trial court to impose the maximum sentence allowed by law, an indeterminate prison sentence of twenty-five years to life. J.A. 652 (Sentencing Tr. 5:3–5). The prosecutor based this recommendation on

his statement to the court that "[t]he responsibility for the death of the deceased is directly attributable to both defendants [i.e., Mr. Baker and Mr. Allick] equally," *id.* (Sentencing Tr. 4:18–19)—notwithstanding the undisputed fact that Mr. Allick, not Mr. Baker, was the one who pushed Mr. Luna to his death, S.A. 2. The prosecutor also argued that Mr. Baker "should be isolated from open society for as long a period of time [sic] if he does not accept his responsibility." *Id.* (Sentencing Tr. 4:12–14).

The trial court then gave Mr. Bruno the opportunity to speak on Mr. Baker's behalf, an opportunity which Mr. Bruno could have used to correct the prosecutor's inflammatory mischaracterization of Mr. Baker's culpability in the crime. Instead, Mr. Bruno chose not to advocate for a sentence below the maximum. In fact, he said nothing at all on his client's behalf—nothing, that is, except to proffer to the court:

> Your honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time.

*Id.* (Sentencing Tr. 5:8–11).

Notwithstanding Mr. Bruno's unjustified belief that "there is nothing [he] could add," in fact, competent counsel could and would have made a compelling presentation on Mr. Baker's behalf:

First, Mr. Bruno could have, but did not, emphasize Mr. Baker's limited role in the offense. Contrary to the prosecutor's assertion that Mr. Baker and Mr. Allick bore equal culpability for the crime, the undisputed evidence established that it was

Mr. Allick, not Mr. Baker, who pushed Mr. Luna to his death. S.A. 2. Relatedly, Mr. Bruno could have argued that Mr. Baker's lack of intent to cause Mr. Luna's death counseled in favor of a more lenient sentence—after all, Mr. Baker had been convicted of felony murder, a crime that has no element of intent with respect to the killing. *See* N.Y. Penal Law § 125.25(3). Moreover, Mr. Bruno could have challenged the trial testimony that Mr. Baker had taken property from Mr. Luna's pockets—citing Mr. Warner's statement in his plea allocution that it was he, not Mr. Baker, who had taken the property. Taken together, Mr. Bruno could have presented a strong case that Mr. Baker had played a minimal role in the offense—that he had neither robbed nor killed the victim. Such a presentation would have powerfully counseled for the minimum sentence of fifteen years to life. *See* N.Y. Penal Law § 70.00(2)–(3).

Second, Mr. Bruno could have, but did not, correct the prejudicial errors in the PSR.[8] Such errors included, first and foremost, the two statements that Mr. Baker "caused the death of Ramiro Ramos-Luna, by throwing him down a flight of stairs." J.A. 322, 325. Additional errors included the statement that Mr. Baker was a member of The Bloods gang and that he grew up in a "moderately stable home environment."

---

[8] While not a prejudicial error, Mr. Bruno did not even correct the PSR for listing "Larry Shekhan" as Mr. Baker's "Defense Counsel," despite nobody of that name ever having represented Mr. Baker. J.A. 321.

J.A. 323, 325. But Mr. Bruno never objected to or corrected these errors.[9] And because Mr. Bruno never shared the PSR with Mr. Baker, Mr. Baker had no opportunity to set the record straight himself.

Third, and finally, Mr. Bruno could have presented the extensive mitigating facts about Mr. Baker's youth, upbringing, and life circumstances, facts of which Mr. Bruno remained mostly unaware because he had not investigated them. Such facts would have painted a more complete picture of Mr. Baker's life for the trial court, providing context for the offense and explaining why Mr. Baker was more prone to being in the wrong place at the wrong time than someone of a different background. These facts could have been used to explain that Mr. Baker was not a hardened criminal, but rather an unfortunate and vulnerable teenager who deserved a second chance. The few such facts raised in the PSR were no substitute for a

---

[9] The *prosecutor*, not Mr. Bruno, pointed out to the court that "there may be one or two slight inaccuracies in the records as they were recounted by the probation report," but the sentencing transcript contains no specific mentions of the errors noted above. J.A. 652 (Sentencing Tr. 3:22–24). Additionally, as the district court noted, S.A. 6 n.11, at a later point in the proceeding Mr. Bruno attempted to clarify that a prior offense listed in the PSR's criminal history was a "YO," i.e., a Youthful Offender offense, J.A. 653 (Sentencing Tr. 8:3–5). However, this exchange occurred after the trial court had already imposed its sentence on the second-degree murder conviction, and as the parties were discussing an unrelated robbery offense to which Mr. Baker was about to plead guilty and then be sentenced. *See* J.A. 653 (Sentencing Tr. 6:24–25) (court transitioning from the second-degree murder sentencing to the "open" robbery case). Accordingly, even this minimal effort by Mr. Bruno could have had no ameliorating impact on the sentence for the murder conviction.

presentation by counsel, particularly since an able counsel could have drawn a causal connection between Mr. Baker's upbringing and his later participation in the offense.

Finally, and compounding his earlier missteps, Mr. Bruno never explained to Mr. Baker that he would have the opportunity to make a statement on his own behalf at sentencing. J.A. 339. Mr. Bruno never explained that such a statement could be beneficial, particularly if Mr. Baker expressed to the court the regret and remorse that he was feeling about the offense. J.A. 341–42. Had Mr. Bruno explained all this to his young client, Mr. Baker would have made a statement expressing remorse. *Id.* But instead, when the court asked Mr. Baker if he "wish[ed] to make any statement to this Court" before being sentenced, Mr. Baker replied, "[n]ot at all."[10] J.A. 652 (Sentencing Tr. 5:15).

The trial court then sentenced Mr. Baker to an indeterminate term of imprisonment of twenty years to life. In support of such a sentence, the court relied on two erroneous factual findings, both of which went uncorrected by Mr. Bruno: First, that Mr. Baker had "assisted in the acts . . . of throwing the victim down a

---

[10] The PSR also states that Mr. Baker "maintained that he is innocent." J.A. 323. This likely reflects Mr. Baker's view that he could not have been guilty of murder when he neither robbed nor killed Mr. Luna. J.A. 334, 338–39. In other words, it is not that Mr. Baker did not feel remorse—he did—but that he did not understand the felony-murder rule because Mr. Bruno had never explained it to him. *See* J.A. 341–42. Nevertheless, this line in the PSR may have contributed to the trial court's erroneous conclusion that Mr. Baker had not accepted responsibility—a misimpression that could have been corrected through effective advocacy.

flight of stairs, leading to his death," J.A. 652–53 (Sentencing Tr. 5:23–6:1), and second, that Mr. Baker had not "in any way . . . accepted responsibility for what [he had] done." J.A. 653 (Sentencing Tr. 6:9–14).

As of July 2023, Mr. Baker is serving his sentence at the Wallkill Correctional Facility in Walkill, New York.[11] He is ineligible for parole until September 2028. Had he received the statutory minimum sentence—which he very well might have if Mr. Bruno had made even minimal advocacy on his behalf—Mr. Baker would have become eligible for parole this year.

<u>State Court Post-Conviction Proceedings</u>

On April 15, 2014, Mr. Baker, represented by new counsel, filed a motion under N.Y. Criminal Procedure Law § 440.10 to vacate his judgment of conviction because it was obtained in violation of his Sixth Amendment right to the assistance of counsel. Mr. Baker argued that Mr. Bruno's performance at sentencing—as well as his failure to properly advise Mr. Baker about the plea offer—both constituted a deficient performance falling below the constitutional standard.

In the course of the state post-conviction proceeding, Mr. Bruno offered the following conclusory and post-hoc rationale for his performance at sentencing, recounted in an affidavit supplied by the Bronx District Attorney's Office:

---

[11] At the time Mr. Baker filed his § 2254 petition, he was incarcerated at Attica Correctional Facility in Attica, New York. James Conway, the superintendent of Attica Correctional Facility, is named as the Respondent-Appellee in this action.

> [Bruno] further explained that telling a judge about a
> defendant's difficult childhood backfires the vast majority
> of the time and does not mitigate killing. He prefers to
> make brief records in front of sentencing judges so as not
> to "put the cart before the horse" for any future appeal.

S.A. 6 n.12.

The trial court denied Mr. Baker's motion in its entirety—without a hearing—in an opinion dated September 3, 2014. J.A. 190–99. The trial court unreasonably concluded that "counsel provided defendant with meaningful representation." J.A. 193. With respect to Mr. Baker's specific claim regarding Mr. Bruno's performance at sentencing, the trial court cited Mr. Bruno's refusal to make a statement on Mr. Baker's behalf as evidence for the unreasonable—indeed, obviously erroneous—proposition that "there were no mitigating circumstances in the facts of the case." J.A. 198.[12]

Mr. Baker appealed the denial of his C.P.L. § 440.10 motion to the New York Supreme Court, Appellate Division, First Department.[13] Mr. Baker sought relief from the Appellate Division on several grounds: that (1) Mr. Baker was denied the effective assistance of counsel at sentencing when Mr. Bruno declined to make any advocacy on Mr. Baker's behalf; (2) Mr. Baker was denied the effective assistance

---

[12] In other words, through circular reasoning, the trial court relied on Mr. Bruno's deficient representation for the conclusion that Mr. Bruno's representation was not deficient.

[13] This appeal was consolidated with Mr. Baker's direct appeal of his conviction.

of counsel at the plea-bargaining stage when Mr. Bruno failed to convey basic, essential information about an opportunity to plead down to a manslaughter conviction and a determinate fourteen-year sentence; and (3) the trial court deprived Mr. Baker of the right to assistance of counsel by failing to act on his pro se pre-trial motion for appointment of new counsel.[14]

In a short opinion dated May 26, 2016, the New York Supreme Court, Appellate Division, First Department affirmed the trial court's decision denying Mr. Baker's motion. J.A. 39–41. Like the trial court, the Appellate Division unreasonably applied the Sixth Amendment and *Strickland* when it concluded that "[i]n all respects, defendant received effective assistance of counsel under the state and federal standards." J.A. 40. The court dedicated only a single sentence to Mr. Baker's claim about Mr. Bruno's ineffective assistance at sentencing, simply noting that Mr. Baker "received a less than maximum sentence despite the heinous facts of the crime," and concluding that he "has not shown that the additional steps he faults his counsel for omitting could have led to even greater leniency." J.A. 41.

---

[14] Mr. Baker also contended that he was denied his constitutional right to presence when the trial court unreasonably excluded him from a material pretrial hearing regarding protective orders for key prosecution witnesses.

Mr. Baker sought leave to appeal the Appellate Division's decision. The New York Court of Appeals denied such leave in an order dated October 24, 2016. J.A. 24.

Federal Habeas Corpus Proceedings

On January 18, 2018, Mr. Baker filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of New York. J.A. 8–22. Mr. Baker's federal habeas petition presented the same issues that he had previously raised before the Appellate Division, including that Mr. Bruno's performance at sentencing was constitutionally inadequate. On November 25, 2019, the Magistrate Judge (Hon. Stewart D. Aaron) issued a Report and Recommendation recommending that Mr. Baker's petition be denied in its entirety. J.A. 840. Mr. Baker timely filed objections. On December 13, 2022, the district court (Hon. Edgardo Ramos) issued an Opinion and Order adopting the Report and Recommendation in its entirety and denying Mr. Baker's petition. S.A. 1.

As to Mr. Baker's argument that he was denied the effective assistance of counsel at sentencing, the district court first rejected Mr. Baker's contention that the presumption of prejudice set forth in *United States v. Cronic*, 466 U.S. 648 (1984), ought to apply to a situation where, as here, counsel offers no advocacy whatsoever on his client's behalf at a sentencing hearing. S.A. 21–23 & 23 n.19. The district

court then considered and rejected Mr. Baker's contention that the Appellate Division had unreasonably applied *Strickland* in concluding that Mr. Bruno's performance at sentencing was constitutionally adequate. S.A. 23–25. The district court therefore denied Mr. Baker's petition in its entirety. The district court also declined to issue a certificate of appealability. *Id.* at 35. Mr. Baker filed a timely notice of appeal. J.A. 907.

On January 12, 2023, Mr. Baker moved this Court to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Rule 22(b) of the Federal Rules of Appellate Procedure. Mr. Baker sought a certificate of appealability on two grounds: first, that he had made a substantial showing that he was denied his Sixth Amendment right to counsel because his trial attorney provided ineffective assistance at his sentencing hearing; and second, that he had made a substantial showing that he was also denied his Sixth Amendment right to counsel when the trial court declined to address his pre-trial motion for a new attorney. On April 20, 2023, this Court granted in part and denied in part Mr. Baker's motion for a certificate of appealability. This Court granted Mr. Baker's motion "to the extent that Appellant challenges his counsel's performance because that performance may be 'sufficient to undermine confidence in the outcome' of the sentence. *Strickland v. Washington*, 466 U.S. 668, 693 (1984)." Dkt. No. 32. This Court denied Mr. Baker's motion as to his argument that the trial court's denial of his pro se motion

for assignment of different counsel violated the Sixth Amendment. *Id.* This appeal followed.

## SUMMARY OF ARGUMENT

The New York Supreme Court, Bronx County and the Appellate Division, First Department unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Cronic*, 466 U.S. 648 (1984), in denying Mr. Baker's motion for post-conviction relief, and the district court similarly erred in denying Mr. Baker's 28 U.S.C. § 2254 habeas petition.

As to *Strickland*'s first prong, whether counsel's performance fell below an objective standard of reasonableness, 466 U.S. at 688, the record here amply demonstrates that—both before and during the sentencing hearing—Mr. Bruno effectively abandoned his client. He did not investigate mitigating circumstances, did not correct errors in the PSR, did not make a presentation on Mr. Baker's behalf, and did not counsel Mr. Baker to make a statement expressing the remorse that he truly felt. Unsurprisingly, both this Court and other appellate courts have found lawyers' condut to be objectively unreasonable when they "did little more than simply attend [their clients'] sentencing hearing[s]." *Gonzalez v. United States*, 722 F.3d 118, 130, 136 (2d Cir. 2013); *see also Miller v. Martin*, 481 F.3d 468, 471 (7th Cir. 2007). This Court should hold the same with regard to Mr. Bruno's performance before and during Mr. Baker's sentencing.

As to *Strickland*'s second prong, on the facts here—where Mr. Bruno "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," *Cronic*, 466 U.S. at 659—Mr. Baker is excused from having to demonstrate *Strickland* prejudice because "the adversary process itself [was] presumptively unreliable," *id.*; *see also Lewis v. Zatecky*, 993 F.3d 994, 999 (7th Cir. 2021) ("If *Cronic* applies . . . prejudice need not be shown."), *cert. denied sub nom. Reagle v. Lewis*, 142 S. Ct. 897 (2022). But in any event, Mr. Baker can also show a "reasonable probability" that he would have received a lighter sentence "but for counsel's unprofessional errors," *Strickland*, 466 U.S. at 694. In imposing Mr. Baker's sentence, the sentencing court relied on demonstrably erroneous statements about Mr. Baker's role in the offense and Mr. Baker's lack of remorse, all of which went uncorrected by Mr. Bruno. Moreover, the post-conviction record reveals that the sentencing court was also unaware of significant mitigating facts relating to Mr. Baker's difficult childhood and upbringing. All of this makes clear that Mr. Bruno's deficient performance was "sufficient to undermine confidence in the outcome" of the sentence. *Strickland*, 466 U.S. at 693. This Court should vacate Mr. Baker's sentence and remand the case for resentencing with the benefit of effective representation.

## ARGUMENT

The Sixth Amendment guarantees every criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). "If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984) (quoting U.S. Const. amend VI). Put differently, "the adversarial process protected by the Sixth Amendment requires that the accused 'have counsel acting in the role of an advocate'"—someone to challenge the government's case and to advocate for mitigation and leniency. *Id*. at 656 (citing *Anders v. California*, 386 U.S. 738, 743 (1967)).

A claim of ineffective assistance of counsel is evaluated under the familiar two-prong standard described in *Strickland*; to succeed thereunder, a petitioner must demonstrate: (1) that counsel's performance was so deficient as to fall below an "objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. But if "the process loses its character as a confrontation between adversaries," by, for example, "counsel "entirely fail[ing] to subject the prosecution's case to meaningful adversarial

testing," *Cronic*, 466 U.S. at 657–59, then the court must presume that *Strickland*'s second prong is satisfied. Here, Mr. Bruno was plainly ineffective by failing to offer even minimal advocacy on Sean Baker's behalf. And because counsel entirely failed to subject the prosecution's case at sentencing to adversarial testing, Mr. Baker qualifies for a presumption of prejudice. In any event, because there is a reasonable probability that Mr. Baker received a greater sentence than he otherwise would have, prejudice is easily demonstrated. This Court should therefore vacate Mr. Baker's sentence and remand the case for resentencing with the benefit of constitutionally adequate counsel.

## I. STANDARD OF REVIEW

This Court reviews "a district court's denial of a petition for a writ of habeas corpus *de novo*." *Tavarez v. Larkin*, 814 F.3d 644, 648 (2d Cir. 2016). As to the underlying state court decision, a petitioner "who challenges (in a federal habeas court) a matter adjudicated on the merits in State court [must] show that the relevant state-court decision (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (internal quotation marks omitted) (quoting 28 U.S.C. § 2254(d)(1)–(2)). The standard of review embodied in § 2254(d) requires "substantial deference to the state court's decision," *Waiters v. Lee*, 857 F.3d 466,

477 (2d Cir. 2017), but nevertheless allows this Court to grant habeas relief where, as here, the state court's "determination was objectively unreasonable," *id.* at 478 (alteration omitted). Here, the state courts not only unreasonably applied *Strickland* and *Cronic* but also relied on unreasonable findings of fact regarding Mr. Baker's remorse and his role in the offense.

## II.   MR. BRUNO'S ABANDONMENT OF MR. BAKER AT SENTENCING CONSTITUTED DEFICIENT PERFORMANCE UNDER THE SIXTH AMENDMENT STANDARD.

As to *Strickland's* first prong, there can be little doubt that Mr. Bruno's failure to offer any advocacy whatsoever on his client's behalf at the sentencing stage fell below the objective standard of reasonableness required by the Sixth Amendment. Even making "every effort . . . to eliminate the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, the only fair reading of the record here is that Mr. Bruno "did nothing" to advocate for Mr. Baker during the sentencing phase of his criminal proceeding. *Miller v. Martin*, 481 F.3d 468, 471 (7th Cir. 2007). This Court and other courts have repeatedly affirmed that the Constitution demands more from defense counsel. *See, e.g.*, *Gonzalez v. United States*, 722 F.3d 118, 134–35 (2d Cir. 2013) ("no dispute" that counsel's performance was deficient where counsel failed to meet with client before sentencing and failed to rebut prosecution's arguments); *Lewis v. Zatecky*, 993 F.3d 994, 1004, 1006 (7th Cir. 2021) (agreeing that counsel's performance was "clearly deficient" where counsel did not investigate mitigating

27

factors, "did not try to prepare" his client for the hearing, and whose only "assistance" during sentencing was a "statement that he was bowing out"); *Miller*, 481 F.3d at 471 (at sentencing, counsel made no presentation "whatsoever, other than to advise the Court that [he] would not be making a presentation"); *Patrasso v. Nelson*, 121 F.3d 297, 304 (7th Cir. 1997) (finding "deficient performance" where counsel "entirely failed to represent his client" at sentencing); *United States v. Hill*, No. 3:07-cr-407, 2013 WL 3816741 at *3–4 (E.D. Va. July 22, 2013) (counsel "completely 'failed to oppose the prosecution throughout the sentencing proceeding as a whole,'" when he "failed to file any sentencing pleading" and "made no argument whatsoever with respect to Hill's sentence" (quoting *Bell v. Cone*, 535 U.S. 685, 697 (2002)); *Gardiner v. United States*, 679 F. Supp 1143, 1146 (D. Me. 1988) (counsel "declin[ed] to speak at sentencing, or to do anything else on his client's behalf" at sentencing); *see also United States v. Daniels*, 558 F.2d 122, 128 (2d Cir. 1977) (holding that "for all practical purposes [defendant] had no counsel at sentencing and that he was prejudiced by the lack of an advocate who could have . . . made argument in mitigation of any judgment to be imposed").

The record here demonstrates that Mr. Bruno effectively abandoned his client throughout the sentencing stage of the proceeding. After the jury returned a conviction against Mr. Baker, Mr. Baker did not see or speak to Mr. Bruno again until they met in court for the sentencing hearing some three weeks later. J.A. 339–

40. In the days and weeks leading up to the sentencing hearing, Mr. Bruno never spoke to Mr. Baker or any other members of Mr. Baker's family to learn important mitigating facts about Mr. Baker's upbringing and life circumstances. J.A. 339. Further, Mr. Bruno never shared a copy of the PSR with Mr. Baker or discussed the contents of the report with his client, J.A. 340, depriving Mr. Baker of the opportunity to point out prejudicial errors such as the two statements that Mr. Baker "caused the death" of Mr. Luna, the remark that Mr. Baker was a member of The Bloods gang, the suggestion that Mr. Baker did not feel remorse for his role in the offense, and the mischaracterization that Mr. Baker grew up in a "moderately stable" home environment, J.A. 322–23, 325, 340. Nor did Mr. Bruno ever meet with Mr. Baker to explain, in Mr. Baker's words, "how the sentencing process worked." J.A. 339. In particular, Mr. Bruno did not advise Mr. Baker that he had the right to make a statement on his own behalf at sentencing, nor did he advise Mr. Baker that it would behoove him to express the remorse that he truly felt about his role in the offense. *Id.*

At the sentencing hearing itself, the prosecution opened with a statement urging the court to impose the maximum sentence. J.A. 652 (Sentencing Tr. 4:8–5:5). In response, Mr. Bruno stated that "there is nothing I could add" and that "I would be foolish to rehash any facts at this time." *Id.* (Sentencing Tr. 5:8–11). In other words, he "did nothing." *Miller*, 481 F.3d at 471. He did not emphasize Mr.

Baker's limited role in the offense, including the fact that Mr. Baker had not directly contributed to Mr. Luna's death, had no demonstrated intent with respect to Mr. Luna's death, and may not even have robbed Mr. Luna (per Mr. Warner's plea allocution). Nor did Mr. Bruno present any mitigating facts and circumstances surrounding his client's life and upbringing—not even the few such facts that Mr. Bruno would have been aware of from simply reading the PSR, such as Mr. Baker's youth at the time of the offense. J.A. 321, 324–25; s*ee People v. Wilt*, 18 A.D.3d 971, 973 (3d Dep't 2005) (reducing defendant's sentence after considering "several mitigating factors, including defendant's youth"); *cf. People v. Matias*, 205 A.D.3d 557, 558 (1st Dep't 2022) (denying claim of infective assistance where counsel "cited defendant's youth and other mitigating factors"). Nor did Mr. Bruno correct any of the errors in the PSR.[15] And because Mr. Bruno had not properly advised his client, Mr. Baker chose not to make a statement on his own behalf, thus leaving uncorrected the prosecutor's erroneous statement that Mr. Baker did not feel remorse or regret for his crime. The result was an entirely one-sided sentencing hearing, one that Mr. Bruno "did little more than simply attend." *Gonzalez*, 722 F.3d at 136.

---

[15] Perhaps the best evidence that Mr. Bruno failed to pay any attention to the PSR is that he did not even correct the PSR's identification of Mr. Baker's defense counsel as "Larry Shekhan." J.A. 321. No one by that name represented Mr. Baker.

As an initial matter, it is of no moment that Mr. Bruno's most glaring errors occurred at the sentencing stage, rather than during the trial. Both this Court and the Supreme Court have held that the Sixth Amendment guarantee extends to "all critical stages in the proceeding," such that a counsel's deficient performance at sentencing can be sufficient to violate the first prong of *Strickland*. *Gonzalez*, 722 F.3d at 130, 136 (counsel's performance at sentencing constituted ineffective assistance); *see, e.g.*, *Glover v. United States*, 531 U.S. 198, 201 (2001) (counsel was ineffective for failing to contest government's erroneous U.S. Sentencing Guidelines calculation); *cf. Lafler v. Cooper*, 566 U.S. 156, 165 (2012) ("[T]here exists a right to counsel during sentencing."); *Mempa v. Rhay*, 389 U.S. 128, 134 (1967) (describing "the critical nature of sentencing in a criminal case" and holding that the Sixth Amendment's guarantee of counsel applies at all sentencing proceedings).

Nor can Mr. Bruno's performance be excused as falling "within the wide range of reasonable professional assistance" that passes muster under the first prong of *Strickland*. 466 U.S. at 689. *Gonzalez*, 722 F.3d 118, is particularly instructive. There, as here, counsel failed to meet with his client to prepare for sentencing, failed to have his client review the PSR, failed to file a sentencing memorandum, failed to respond to the prosecutor's sentencing recommendation, "failed to seek any sentencing leniency," and in fact "fail[ed] to engage in any advocacy with respect to [his client's] sentencing" at all. *Id.* at 127, 135. Like Mr. Bruno, the lawyer in

*Gonzalez* "did little more than simply attend [his client's] sentencing hearing." *Id.* at 136. Indeed, Mr. Bruno did even less than the lawyer in *Gonzalez*, because the lawyer there at least showed his client the PSR. *Id.* at 127. Mr. Bruno did not. Faced with these facts in *Gonzalez*, this Court concluded that "[t]here is no dispute over whether [trial counsel's] performance was deficient with regard to sentencing. It was." *Id.* at 134.[16]

The facts of *Miller*, 481 F.3d at 468, are similarly on point. Defense counsel there, like Mr. Bruno, "did not offer a shred of mitigating evidence, object to (or consult with his client about) errors in the PSR, or even lobby for a sentence lower than the one urged by the State." *Id.* at 473. Indeed, counsel remained "mute" in response to the prosecution's recommendation for a heavy sentence, as did the defendant, on counsel's instructions. *Id.* at 470. "In [counsel's] own words, he 'did nothing.'" *Id.* at 473. On these facts, the Seventh Circuit had no trouble finding that counsel's "advocacy at sentencing was so non-existent as to" constitute ineffective assistance. *Id.* at 473.

---

[16] Additionally, in *Gonzalez*, counsel failed to challenge the imposition of an aggravating role enhancement. 722 F.3d at 129. Here, analogously, counsel failed to argue for a lenient sentence on the ground of Mr. Baker's limited role in the offense, a factor relevant to sentencing in New York. *See infra* Section III.B (citing authorities).

As did these earlier courts, so too should this Court reject any contention that Mr. Bruno's actions (rather, his inaction) before and during Mr. Baker's sentencing reflected any kind of strategic thinking. By way of justification for his failure to present mitigating evidence at sentencing, Mr. Bruno offered his belief that "telling a judge about a defendant's difficult childhood backfires the vast majority of the time and does not mitigate killing." S.A. 6 n.12. But this rationale fails on its own terms, because Mr. Baker did *not* kill Mr. Luna; Mr. Allick did. *See* S.A. 2. There is no justification for Mr. Bruno's apparent certainty that Mr. Baker's "difficult childhood," in combination with Mr. Baker's limited role in the offense, would not have made a difference at sentencing. Although "there will be times when the tenor of a court's colloquy might well persuade counsel that silence is his best option," *United States v. Gooding*, 594 Fed. App'x 123, 130 (4th Cir. 2014), at the time of Mr. Bruno's statement that "there is nothing I could add," the sentencing judge had not made any comments to suggest that mitigating evidence would not have been welcome. Thus, Mr. Bruno's portrayal of his decision to make a short, prejudicial statement at sentencing and not present any mitigating evidence as a strategic decision "is at best labored and the result of a gross misperception and, at worst, fabricated out of thin air." *Gardiner*, 679 F. Supp. at 1146.

Moreover, Mr. Bruno could not have had a valid strategic reason for not *presenting* mitigating evidence at sentencing, because he failed even to *investigate*

such circumstances in the first place—particularly after being put on notice by the PSR that some mitigating facts were present. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). When counsel asserts the reason for not presenting mitigating evidence is strategic, courts do not credit such assertions when counsel fails even to investigate mitigating circumstances. *Lewis*, 993 F.3d at 1006 (not crediting defense counsel's purported strategy for failing to present mitigating evidence relating to the defendant's mental health where counsel "had no idea one way or the other" whether such evidence existed "because he never asked Lewis about his mental-health history and he never requested Lewis's medical records"); *Miller*, 481 F.3d at 474 (finding ineffective assistance of counsel where counsel "did not present, or even research, any mitigating factors"); *Patrasso*, 121 F.3d at 304–05 ("Had [defense counsel] made a strategic choice to withhold possibly damaging evidence, *Strickland* would mandate finding unsuccessful but nevertheless effective assistance. [Defense counsel], however, barely spoke with his client and performed no investigation; he had no information and so could not have reasonably considered his available strategies."); c*f. Bell v. Miller*, 500 F.3d 149, 156–57 (2d Cir. 2007) (counsel's decision not to consult with a medical expert could not have been strategic because counsel did not even consider doing so). After all, counsel cannot reasonably make an informed strategic decision not to present

mitigating evidence without knowing what mitigating evidence there is. *See Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all.").

Nor does this justification explain Mr. Bruno's more serious failure to make an appeal for leniency based on Mr. Baker's youth, limited role in the crime, his lack of direct responsibility for the death of the victim, and his lack of intent to cause the victim's death. There is, moreover, no plausible justification for Mr. Bruno's failure to prepare Mr. Baker for sentencing, *cf. Florida v. Nixon*, 543 U.S. 175, 178 (2004) ("Defense counsel undoubtedly has a duty to discuss potential strategies with the defendant."), nor for Mr. Bruno's failure to advise Mr. Baker to make a statement on his own behalf, *see Lewis* 993 F.3d at 1006 ("[Counsel] never communicated any such strategy to [the defendant], and so [the defendant] had no guidance from counsel about what he might do with his allocution when he had the chance to speak."). By way of explanation, Mr. Bruno offered only that he "prefers to make brief records in front of sentencing judges so as not to 'put the cart before the horse' for any future appeal," S.A. 6 n.12. But this too is nonsensical. No competent attorney would rationally decide not to raise an issue before a trial court in the hopes of raising that issue for the first time on appeal. *Cf. Garvey v. Duncan*, 485 F.3d 709, 714–16 (2d Cir. 2007) (describing the rule under New York law that issues must be raised before a trial court to be preserved for appeal). And to the extent Mr. Bruno

was suggesting that Mr. Baker could have challenged his sentence on direct appeal, Mr. Bruno in any event failed to develop a record at sentencing that could have been used as the basis for such a challenge. *Cf. People v. Carter*, 200 A.D.3d 1719, 1719 (4th Dep't 2021) (denying motion to reduce defendant's sentence in the interest of justice where there was "no basis in the record" for the exercise of the court's authority); *People v. Vega*, 73 A.D.3d 1218, 1218–1219 (2d Dep't 2010) (denying the same where "the record reveals no mitigating or extraordinary circumstances warranting a reduction" of the sentence). Thus, to hold that strategy justified Mr. Bruno's performance at sentencing would be "to make a mockery of the word." *Miller*, 481 F.3d at 473.

On this analysis, it is clear that the state post-conviction decisions unreasonably applied *Strickland* in holding that Mr. Bruno's performance passed constitutional muster. Inappropriately aggregating the various aspects of Mr. Bruno's representation, rather than evaluating the specific, egregious mistakes discussed herein, the New York Supreme Court, Bronx County held that "counsel provided defendant with meaningful representation, which did not fall outside the 'wide range of professionally competent assistance.'" J.A. 193 (quoting *Strickland*, 466 U.S. at 690). The Appellate Division, First Department adopted that conclusion with little additional analysis, holding that "[i]n all respects, defendant received

effective assistance of counsel under the state and federal standards."[17] J.A. 40. But that conclusion is contrary to the numerous appellate court decisions applying *Strickland*, which squarely hold that counsel who "d[o] nothing" at sentencing are ineffective. *Miller*, 481 F.3d 468, 471; *see, e.g.*, *Gonzalez*, 722 F.3d at 134–35; *Lewis*, 993 F.3d at 1004–06; *Patrasso v. Nelson*, 121 F.3d at 304. The district court similarly erred by downplaying the magnitude of Mr. Bruno's errors, characterizing Mr. Baker's argument as merely that Mr. Bruno "failed to share the PSR with him and make various arguments at sentencing." S.A. 24. The reality is that Mr. Bruno failed to do *anything* during the sentencing phase of the proceeding, whether to prepare Mr. Baker, to investigate, or to present advocacy. No decision below has advanced a persuasive rationale that this conduct was constitutionally acceptable, because no such rationale exists.

## III. PREJUDICE TO MR. BAKER IS PRESUMED, OR, IN THE ALTERNATIVE, IS READILY DEMONSTRATED.

### A. Because Mr. Bruno Failed to Subject the State's Case to Meaningful Adversarial Testing, This Court Should Presume Prejudice Under *United States v. Cronic*.

*Strickland's* second prong generally requires a showing of prejudice to the defendant, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. In

---

[17] Both decisions also unreasonably applied the prejudice prong of the *Strickland* analysis, as discussed below.

rare cases, however, including those involving the abject failure of counsel, the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," and prejudice is presumed. *Cronic*, 466 U.S. at 658; *see also Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."). This is one of those cases. The state court thus unreasonably applied *Cronic* in declining to apply a presumption of *Strickland* prejudice to Mr. Baker's performance, and the district court similarly erred.

*Cronic* and its progeny provide that the presumption of prejudice applies in each of three scenarios. *See Bell v. Cone*, 535 U.S. 685, 695–96 (2002); *Cronic*, 466 U.S. at 659–60. The first "is the complete denial of counsel . . . at a critical stage of his trial." *Cronic*, 466 U.S. at 659. The second is when counsel, although present, "entirely fails to subject the prosecution's case to meaningful adversarial testing," such that "the adversary process itself [becomes] presumptively unreliable." *Id.* The third is when, even though counsel is present, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Id.* at 659–60; *accord Garza v. Idaho*, 139 S. Ct. 738, 744 (2019); *Bell*, 535 U.S. at 695–96.

The facts of this case fall squarely in the second *Cronic* scenario: By abandoning his client and offering no advocacy during the sentencing phase of Mr.

Baker's criminal proceeding, Mr. Bruno "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," such that "the adversary process itself [became] presumptively unreliable" in this proceeding. *Cronic*, 466 U.S. at 659.

The Supreme Court has recognized that the *Cronic* presumption applies where defense counsel entirely fails throughout the sentencing stage of a criminal proceeding to subject the prosecution's case to meaningful adversarial testing. *See Bell*, 535 U.S. at 697; *cf. Lafler*, 566 U.S. at 165 ("The precedents also establish that there exists a right to counsel during sentencing in both noncapital . . . and capital cases." (citations omitted)); *Mempa*, 389 U.S. at 134 (describing "the critical nature of sentencing in a criminal case"). In *Bell v. Cone*, the defendant challenged his attorney's representation at specific parts of the sentencing proceeding, though not the entire sentencing phrase, and not the trial. The Supreme Court rejected the defendant's challenge to his counsel's performance on the ground that "respondent's argument is not that his counsel failed to oppose the prosecution *throughout the sentencing proceeding as a whole*, but that his counsel failed to do *so at specific points*." *Bell*, 535 U.S. at 697 (emphasis added). This holding makes clear that *Cronic* applies at sentencing, even when counsel did not abandon his client at trial, where the failure to subject the prosecution's case to adversarial testing stretches across the sentencing phase as a whole. Thus, the Supreme Court has recognized that

a *complete* failure to test the government's case throughout the sentencing proceeding would, under *Cronic*, trigger a presumption of *Strickland* prejudice.[18]

It is thus unsurprising that various other Circuits have applied the *Cronic* presumption to counsel's deficient performance at sentencing, even where the defendant did not challenge that counsel's performance at trial. *See, e.g.*, *Lewis*, 993 F.3d at 1005–06 (applying *Cronic* to deficient assistance at sentencing); *Phillips v. White*, 851 F.3d 567, 581 (6th Cir. 2017) (applying the *Cronic* presumption to deficient assistance at sentencing where the appellant did not raise an ineffective assistance claim regarding counsel's conduct at trial); *Patrasso*, 121 F.3d at 303–04 (applying the *Cronic* presumption at resentencing, "distinguish[ing the sentencing phase] from the conviction phase," where the court rejected the application of *Cronic*); *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (finding "constructive denial of" counsel at a resentencing hearing after rejecting the *Cronic* presumption at the trial stage).[19] At least one district court within this Circuit has recognized that

---

[18] While this Court has not yet, in a published opinion, applied the *Cronic* presumption at the sentencing stage where defense counsel entirely failed to subject the prosecution's case to adversarial testing, this Court has endorsed very similar logic by applying the *Cronic* presumption to counsel's deficient performance at the jury selection stage. *See Norde v. Keane*, 294 F.3d 401, 413–14 (2d Cir. 2002) (applying *Cronic* presumption for constructive denial of counsel at jury selection stage in habeas case, even though the court did not find his attorney's performance deficient during trial).

[19] *See also United States v. Detloff*, No.13-20298, 2017 WL 1151072 at *6–9 (E.D. Mich. Mar. 28, 2017) (applying *Cronic* for counsel's deficient performance at the
(….continued)

the Second Circuit has done the same. *McLean v. United States*, No. 08-cr-789 (RJS), 2016 WL 3910664, at *11 (S.D.N.Y. July 13, 2016) (affirmatively citing unpublished Second Circuit opinion that holds that the *Cronic* presumption applies to sentencing, even while declining to apply it to the case at hand).

Applying *Cronic* to the facts of this case, the Court should presume that Mr. Baker suffered *Strickland* prejudice because of Mr. Bruno's complete failure to subject the prosecution's case at sentencing to adversarial testing. As recounted above, aside from showing up for court that day, Mr. Bruno "did nothing." *Miller* 481 F.3d at 473. He did not prepare for the hearing by investigating potential mitigating circumstances, did not introduce or reference any mitigating evidence, did not correct errors in the PSR, did not question the judge's mischaracterization of the evidence, and did not ask the court to impose a sentence less than the one urged by the State. Instead, Mr. Bruno made a short statement (one that was, if anything, *harmful* to Mr. Baker's interests) to the sentencing court, saying, "Your Honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time." J.A. 652

---

sentencing proceeding); *Hill*, 2013 WL 3816741 at *3–4 (same); *Gardiner*, 679 F. Supp at 1145–48 (same); *cf. United States v. Collins*, 430 F.3d 1260, 1266 (10th Cir. 2005) (applying *Cronic* where counsel "did not subject the prosecution's case to adversarial testing" during the competency hearing, without evaluating counsel's conduct during trial).

(Sentencing Tr. 5:8–11). Mr. Bruno thus "entirely fail[ed] to subject the prosecution's case to meaningful adversary testing." *Cronic*, 466 U.S. at 659.

In denying the application of the *Cronic* presumption, the District Court credited comments Mr. Bruno made, later in the sentencing transcript, on Mr. Baker's behalf by clarifying that a prior offense listed in the PSR was a Youthful Offender offense. S.A. 6 n.11; *see* J.A. 653 (Sentencing Tr. 8:3–5). But this action does not negate the conclusion that Mr. Bruno failed to subject the prosecution's case to meaningful adversarial testing. This statement by Mr. Bruno occurred *after* the sentencing court imposed Mr. Baker's sentence on the felony murder conviction, *see id.* (Sentencing Tr. 6:15–18), and while the court was discussing sentencing Mr. Baker on a separate robbery offense to which Mr. Baker had not even pled guilty, *id.* (Sentencing Tr. 7:7–9, 9:2–19).[20] That was, in effect, a separate guilty plea and sentencing in a separate criminal proceeding. And because the *Strickland* and *Cronic* analysis applies separately at each sentencing, *see Tucker*, 969 F.2d at 158 (holding that counsel was ineffective at the defendant's resentencing, despite performing adequately at the defendant's first sentencing), the statement by Mr. Bruno ought not figure into the *Cronic* question before this Court.

---

[20] Immediately after Mr. Baker pled guilty to the unrelated robbery charge, the court sentenced Mr. Baker on that charge. J.A. 654 (Sentencing Tr. 12:7–13:23).

Further, the facts here closely resemble those of *Lewis*, 993 F.3d at 1006, where the Seventh Circuit granted habeas relief to the defendant, Mr. Lewis, holding that the *Cronic* presumption applied to counsel's deficient performance at sentencing. Mr. Lewis, like Mr. Baker, was convicted of felony murder during the course of a robbery where the defendant did not commit the act that killed the victim. *Id*. at 998. Mr. Lewis, like Mr. Baker, rejected a plea deal in large part because he was not properly advised on the felony-murder rule. *Id.*; *see* J.A. 334, 338–39. And like Mr. Bruno, the attorney in *Lewis* did not investigate mitigating factors, nor did he prepare his client to make a statement at sentencing. *Lewis*, 993 F.3d at 998. Instead, Mr. Lewis's attorney stated, "Judge I'm going to defer to Mr. Lewis if he has any comments. I don't have anything to add." *Id.* In granting Mr. Lewis's habeas petition for ineffective assistance of counsel under *Cronic*, the Seventh Circuit explained:

> This [statement] went beyond a failure to conduct adversarial testing; it was an announcement of abandonment. The state suggests that [counsel] did have a strategy, and that was to allow Lewis to speak for himself in the hope that he might express remorse. This has the flaw of having no support in the record. [Counsel] never communicated any such strategy to Lewis, and so Lewis had no guidance from counsel about what he might do with his allocution when he had the chance to speak.

*Id.* at 1006. Here, Mr. Bruno's statement was even more deficient; it was not just "an announcement of abandonment," *id.*, but a concession of defeat. This combined

with Mr. Bruno's failure to investigate or present mitigating evidence, correct the PSR, or rectify the judge's mischaracterization of the evidence was not strategy but rather "a failure to conduct adversarial testing," *id.*, i.e, precisely what triggers the *Cronic* presumption of prejudice, *Cronic*, 466 U.S. at 659.

In refusing to apply *Cronic*, the District Court found that Mr. Baker's case "failed to raise circumstances rising to th[e] magnitude" of *Powell v. Alabama*, 287 U.S. 45 (1932). S.A. 22–23. But the District Court was comparing apples to oranges. In *Cronic*, the Supreme Court provided *Powell* as an example of *Cronic*'s third category of ineffective assistance of counsel—when, even though counsel is present, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Cronic*, 466 U.S. at 659–60; *see Bell*, 535 U.S. at 696 (recounting that *Cronic* used *Powell* as an example for *Cronic*'s third category of the presumption of prejudice). Here, Mr. Baker's counsel was ineffective for "fail[ing] to subject the prosecution's case to meaningful adversarial testing"—*Cronic*'s second category. *Cronic*, 466 U.S. at 659. Therefore, *Powell* is an entirely inapt comparison.

"Rare though [the application of] *Cronic* may be, . . . this one qualifies." *Lewis*, 993 F.3d at 1006. Therefore, the state appellate court's failure to apply *Cronic* was "contrary to" clearly established Supreme Court case law. *See Bell*, 535 U.S. at 694 (noting that federal habeas relief is appropriate "if the state court applies a rule

44

different from the governing law set forth in [Supreme Court] cases"); *Francis S. v. Stone,* 221 F.3d 100, 109 (2d Cir. 2000) ("[S]tate court use of an incorrect legal standard can result in a decision 'contrary to' established Supreme Court law.").

### B. Even If *Cronic* Does Not Apply, *Strickland* Prejudice to Mr. Baker Is Easily Demonstrated.

Even if the *Cronic* presumption is inapplicable, this Court should nevertheless vacate Mr. Baker's sentence because there exists "a reasonable probability that, but for [Mr. Bruno's] unprofessional errors," Mr. Baker would have received a more lenient sentence, potentially as little as the statutory minimum sentence of fifteen years to life imprisonment. *Strickland*, 466 U.S. at 694. The scenario present here— where counsel failed to make *any* advocacy on his client's behalf whatsoever at a sentencing hearing—is certainly "sufficient to undermine confidence in the outcome" of the sentence. *Id.*

Here, as in *Gonzalez* and *Miller*, Mr. Bruno's decision to "d[o] nothing" at sentencing prejudiced Mr. Baker in at least three ways. *Miller*, 481 F.3d at 471 (finding that, on similar facts, counsel's performance resulted in *Strickland* prejudice in the alternative to its principal ruling that the *Cronic* presumption applied); *see Gonzalez*, 722 F.3d at 135–36 (holding, on similar facts, that counsel's performance resulted in *Strickland* prejudice to the defendant).

First, there is a reasonable probability that Mr. Baker would have received a lesser sentence had Mr. Bruno properly advised Mr. Baker to make a statement at

sentencing to express the remorse that he truly felt for his participation in the offense. *See People v. Kerringer*, 195 A.D.3d 861, 863 (2d Dep't 2021) (considering expressions of remorse to be a mitigating factor at sentencing). To reach such a conclusion, this Court need look no further than the words of the sentencing court itself, which justified its harsh sentence in part on the ground that "you have not in any way . . . here today . . . accepted any responsibility for what you've done. Without accepting responsibility for your conduct, it will be impossible for rehabilitation to begin." J.A. 653 (Sentencing Tr. 6:10–14). The trial court was also presented with similar statements by the prosecutor, J.A. 652 (Sentencing Tr. 4:12–14) ("[T]his defendant should be isolated from open society for as long a period of time if he does not accept his responsibility."), and in the PSR, J.A. 323 ("At the interview, the defendant maintained his innocence and hopes to appeal his conviction."[21]), all of which went uncorrected because of Mr. Bruno's ineffective assistance.[22] In fact, Mr. Baker did feel remorse regarding his role in the offense, and he would have expressed such remorse had he been properly advised. J.A. 341–42.

---

[21] As noted above, Mr. Baker did not mean to suggest to the probation officer that he did not feel remorse. Rather, he simply did not understand how he could have been guilty of murder under the facts of his case. *See* J.A. 334, 338–39.

[22] It is no response that Mr. Baker was informed at the sentencing hearing itself—first by the clerk of court and then by the judge—that he could make a statement on his own behalf. J.A. 652 (Sentencing Tr. 3:14–16, 5:13–14). Barely of age and unfamiliar with the legal process, Mr. Baker should have been able to rely on the advice of his lawyer as to his right of allocution, a right which "has long been
(....continued)

Second, there is a reasonable probability that the sentencing court would have imposed a lesser sentence had Mr. Bruno reminded the court that Mr. Baker played a limited role in the underlying offense, and in particular that (1) Mr. Baker played no direct role in Mr. Luna's death, and (2) Mr. Baker had no demonstrated intent to seriously injure or kill Mr. Luna. To see how Mr. Bruno prejudiced Mr. Baker by failing to raise such facts, this Court again need only consider the words of the sentencing court itself. In explaining its reasons for imposing a sentence of twenty years to life imprisonment, the sentencing court stated in part that "[t]he credible evidence in this case established . . . that you assisted in the acts . . . of throwing the victim down a flight of stairs, leading to his death." J.A. 652–53 (Sentencing Tr. 5:18–6:1). But this statement by the sentencing court was *not accurate*. In fact, the uncontroverted evidence in the case established that it was Mr. Baker's co-defendant, Mr. Allick, who *alone* pushed the victim down the flight of stairs. S.A. 2. Far from Mr. Baker "assist[ing]" in that act, J.A. 652 (Sentencing Tr. 5:24), the evidence established the opposite. Mr. Bruno could have corrected the sentencing

---

regarded as substantial." *People v. McClain*, 35 N.Y.2d 483, 490 (1974). This is particularly so because Mr. Baker would likely have internalized prior instructions that, as a defendant, he should not say anything—and that, indeed, anything that he were to say could be used against him. *See Miranda v. Arizona*, 384 U.S. 436, 467–469 (1966); J.A. 341 ("I did not say anything because I did not understand that it would help my case if I provided information to the Court regarding my past or if I expressed the regret and remorse I was feeling about the incident.").

court's erroneous impression by presenting even the most basic advocacy on his client's behalf.

Indeed, Mr. Bruno should have been put on notice of this issue by the prosecutor's similarly incorrect statement at sentencing that "[t]he responsibility for the death of the deceased is directly attributable to both [Mr. Baker] and [Mr. Allick] *equally*," J.A. 652 (Sentencing Tr. 4:18–19) (emphasis added), as well as the statement at two places in the PSR that Mr. Baker "caused the death" of the victim, J.A. 322, 325. Mr. Bruno's failure to remind the sentencing court that it was not his client who killed the victim undoubtedly contributed to the trial court's imposition of a harsh sentence on Mr. Baker. This is particularly so because various New York statutes direct courts in numerous circumstances, including sentencings, to consider as a mitigating factor that "the defendant was not the sole participant in the crime, [and] the defendant's participation was relatively minor although not so minor as to constitute a defense to the prosecution." N.Y. Penal Law § 70.02(4)(b)(ii) (sentencing for certain violent felonies); *accord id.* § 70.25(2-b) (decision to impose concurrent versus consecutive sentences); N.Y. Crim. Pro. § 722.21(5) (decision to remove to family court certain criminal actions against adolescent offenders); *see also* N.Y. Penal Law § 1.05(4) (providing that a "general purpose" of the Penal Laws is "to prescribe proportionate penalties therefor"); *People v. Devone C.*, 161 A.D.3d

648, 648–49 (1st Dep't 2018) (shortening defendant's sentence where defendant had a "limited role" in the crime).[23]

Third, there is a reasonable probability that the trial court would have imposed a lesser sentence had it been aware of Mr. Baker's youth, difficult upbringing, and family circumstances, which Mr. Bruno never bothered to investigate or raise to the court. These circumstances help explain why Mr. Baker made the mistakes that he did, and they suggest that Mr. Baker holds the possibility of rehabilitation if given an opportunity to improve his life.[24] *See People v. Watt*, 189 A.D.3d 637 (1st Dep't 2020) ("We have long held that a defendant's young age may render the individual less culpable[.]"); *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1998) ("[T]his Court has already endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult[.]"); *People v. Farrar*, 52 N.Y.2d 302, 306 (N.Y. 1981) (sentencing court should consider defendant's rehabilitation).

---

[23] It is worth noting that Mr. Warner, the other co-defendant who, like Mr. Baker, bore no direct responsibility for Mr. Luna's death, pled down to a robbery conviction that carried an eight-year sentence. S.A. 5 n.9. And Mr. Baker, of course, had previously been offered a fourteen-year plea deal. S.A. 4. Both of these facts support an inference that there is a reasonable probability that Mr. Baker would have received a lesser sentence had he had adequate representation at sentencing.

[24] During his fifteen years of incarceration, Mr. Baker has earned a High School Equivalency diploma, undertaken vocational training in painting, and earned certificates for other courses, including one in parenting. Upon release, he hopes to start a family and become a positive influence in his community.

Notwithstanding the fact that the PSR recites a few of the obstacles that Mr. Baker faced during his childhood,[25] the record unequivocally demonstrates that the trial court was *not* aware of these circumstances when it sentenced Mr. Baker: the trial court denied Mr. Baker's post-conviction motion in part on the unreasonable and clearly erroneous factual finding that "there were no mitigating circumstances in the facts of the case." J.A. 198. And notwithstanding Mr. Bruno's self-serving assertion that "a defendant's difficult childhood . . . does not mitigate killing," J.A. 222, in fact, there is no basis on the current record to know how the trial court would have ruled had it been aware of these mitigating circumstances. There is thus a reasonable probability that Mr. Baker would have received a lesser sentence if Mr. Bruno had investigated and raised the mitigating facts relating to Mr. Baker's youth and difficult upbringing.

For all these reasons, Mr. Baker can easily demonstrate that Mr. Bruno's actions (rather, his inaction) at sentencing resulted in *Strickland* prejudice. The adverse decisions below rest on unreasonable and erroneous applications of federal law.[26] Contrary to the Appellate Division's reasoning, J.A. 41, it is no response to

---

[25] As noted above, however, the PSR omits any reference to several additional such obstacles, and it errs by stating that Mr. Baker grew up in a "moderately stable home environment," J.A. 325, notwithstanding his experiences in foster care and the shelter system. *See* J.A. 332–33.

[26] Both the decision of the New York state trial court denying Mr. Baker's motion for post-conviction relief and the decision of the district court denying Mr. Baker's
(….continued)

these arguments to say that Mr. Baker received less than the maximum sentence (twenty years to life, rather than twenty-five years to life), which the prosecution had requested. *Strickland*'s prejudice prong asks only whether "there is a reasonable probability that . . . the result of the proceeding would have been different." 466 U.S. at 694. As the Supreme Court has already held, prejudice is not assumed away simply because a defendant did not receive the worst possible outcome under the law. *See Glover* 531 U.S. at 203 (finding *Strickland* prejudice where a defendant was sentenced to a term of imprisonment in the middle of the U.S. Sentencing Guidelines range, and noting that "[a]uthority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

The district court similarly erred by assuming prejudice away simply because the sentencing court had also presided over Mr. Baker's trial. The district court seems to have concluded that Mr. Bruno's failure to raise obvious arguments on Mr.

---

§ 2254 motion rest additionally on several unreasonable and indeed clearly erroneous determinations of fact, some of which have been previously noted, including that "the victim's death was attributable to both defendants equally," J.A. 198, that "there were no mitigating circumstances in the facts of the case," J.A. 198; S.A. 24, and that Mr. Baker "refus[ed] to accept responsibility" and showed "the absence of any remorse," J.A. 198; S.A. 24. Even under AEDPA's deferential standard of review, this Court may correct errors that are so plainly apparent on the trial and post-conviction records. *See* 28 U.S.C. § 2254(d)(2)–(e).

Baker's behalf did not prejudice Mr. Baker because the sentencing court was already familiar with the trial record. S.A. 24. But some three weeks had elapsed between trial and sentencing, and the sentencing court's statement that Mr. Baker "assisted in the acts . . . of throwing the victim down a flight of stairs," S.A. 24 (quoting J.A. 652–53 (Sentencing Tr. 5:23–6:1)), illustrates that its recollection of the trial evidence at the time of sentencing was faulty. And just because the sentencing court had presided at trial certainly does not mean that it was aware of Mr. Baker's life circumstances or that remorse that he was experiencing, neither of which were elicited at trial. Moreover, taken to its logical end, the reasoning of the district court would relieve defense counsel of any Sixth Amendment responsibilities at sentencing, a result directly contrary to numerous precedents of this Court and the Supreme Court. *See Lafler*, 566 U.S. at 165 ("[I]neffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice . . . .").; *Mempa*, 389 U.S.at 134 (holding that, in the face of "the critical nature of sentencing in a criminal case," the Sixth Amendment's guarantee of counsel applies at all sentencing proceedings); *Gonzalez*, 722 F.3d at 136 ("[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" (quoting *Cronic*, 466 U.S. at 656).

Ultimately, counsel's performance during the sentencing phase of Mr. Baker's proceeding was so deficient as to "undermine confidence in the outcome."

*Strickland*, 466 U.S. at 694. Had Mr. Baker received effective assistance of counsel, there is a reasonable probability that he would have received a lesser sentence, up to or including the sentence that he deserved: the minimum. Thus, for all the preceding reasons, the state courts unreasonably applied *Strickland* in denying Mr. Baker's claim.

**CONCLUSION**

For the foregoing reasons, this Court should reverse the district court, grant Mr. Baker's 28 U.S.C. § 2254 habeas petition, vacate his sentence, and remand the case to the state court for resentencing with the benefit of adequate counsel.

Dated: New York, New York
July 20, 2023

Respectfully submitted,

/s/ Amelia T.R. Starr
Amelia T.R. Starr
Yona A. Kornsgold
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
amelia.starr@davispolk.com

Kyle Victor
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
27th Floor
Philadelphia, PA 19103
Telephone: (215) 496-7096
Facsimile: (215) 568-0300
kvictor@hangley.com

David Bernstein
Office of the Appellate Defender
11 Park Place, 16th Floor
New York, NY 10007
dbernstein@oadnyc.org

*Attorneys for Sean Baker*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) because this brief contains 13,285 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
        July 20, 2023

                        Respectfully submitted,


                        */s/ Amelia T.R. Starr*
                        Amelia T.R. Starr
                        Davis Polk & Wardwell LLP
                        450 Lexington Avenue
                        New York, NY 10017
                        Telephone:   (212) 450-4000
                        Facsimile:   (212) 701-5800
                        amelia.starr@davispolk.com

                        *Attorneys for Sean Baker*

SPECIAL APPENDIX

# Table of Contents

**Page**

Opinion and Order of the Honorable Edgardo Ramos,
dated December 13, 2022, Appealed From .................................... SPA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN BAKER,

                          Petitioner,

        – *against* –

JAMES CONWAY,

                          Respondent.

**OPINION & ORDER**

18-cv-478 (ER)

Ramos, D.J.:

        Petitioner Sean Baker ("Baker" or "Petitioner"), through his counsel, filed a

petition for a writ of *habeas corpus* under 28 U.S.C. § 2254 ("Petition") on January 18,

2018.  Doc. 1.  Baker challenged his second degree murder conviction and corresponding

sentence on various grounds.  *See generally id.*  The Court referred the Petition to

Magistrate Judge Stewart D. Aaron on January 29, 2018.  Doc. 5.

        On November 25, 2019, Judge Aaron issued a Report and Recommendation

("Report" or "R & R") recommending that the Court deny Baker's Petition in its entirety.

Doc. 26.  Baker filed his written objections to the Report on December 20, 2019.  Doc.

29.  The Bronx County District Attorney's Office[1] filed a response on March 9, 2022.

Doc. 34.  Baker replied on March 25, 2022.  Doc. 37.

        For the reasons stated herein, the Court adopts the Report in its entirety, and the

Petition is DENIED.

**I.      BACKGROUND**

        The factual background and procedural history relevant to Baker's Petition are set

forth in detail in Magistrate Judge Aaron's Report.  *See* Doc. 26.

---

[1] The Bronx County District Attorney's Office represents respondent James Conway, the superintendent of
Attica Correctional Facility, where Baker is currently incarcerated, pursuant to an agreement with the
Office of the Attorney General of the State of New York.  Doc. 34 at 1.

### A.  Facts Underlying Baker's Murder Conviction

This case stems from the murder of Ramiro Ramos Luna.  *See* Doc. 1-21 at 23–24, 93–95, 199–200.[2]  Surveillance video captured Ramos' assault in the early hours of the morning on October 6, 2007.  *Id.* at 16–25.  Specifically, it registered three young men approach Ramos as he exited from El Patio, a restaurant in the Bronx.  *Id.* at 5, 318–19.  The video showed the three men "pushing [Luna] up the street, throwing him against the wall, going through the pockets . . . . dragging him back" and thereafter throwing him "down the stairs head first."  *Id.* at 12–13, 319.

Several eye-witnesses saw the assault take place.  *See id.* at 4–13.  Specifically, Barbara and Denise Coles—a mother and daughter who knew Baker and his co-defendants (Michael Allick and Kareem Warner) from the community—saw the three men take items from Ramos' pockets, drag him "towards the ditch," and "toss[] him down the stairs."[3]  *Id.* at 7–12.  The three men had different roles during the assault.  At the beginning of the encounter, all three men grabbed a hold of Ramos and dragged him away from the restaurant.  *Id.* at 21.  Thereafter, Warner and Allick held Ramos against the wall while Baker removed various items from his pockets.  *Id.* at 22.  The three men then dragged him toward a flight of stairs, where Allick pushed him down the steps.  *Id.* at 23–24.  Ms. Barbara Coles specifically testified that she saw Allick throw Ramos down the stairs while Baker and Warner stood next to him.  *Id.* at 12.

Paramedics arrived at the scene and found Ramos unresponsive at the bottom of the stairs about an hour later.  *Id.* at 93–95.  A forensic pathologist thereafter concluded that Ramos' cause of death was blunt force trauma to the head.  *Id.* at 200.

The Bronx Homicide Task Force investigated Ramos' murder and interviewed Barbara Coles in January 2008.  *Id.* at 228–29.  She identified Baker and his co-

---

[2] ECF Documents 1-21 and 1-22 contain the transcript from Baker's jury trial.  The Court cites to the ECF pagination.

[3] Barbara and Denise Coles were close enough to the scene that they were captured—and they identified themselves—in the surveillance video footage.  Doc. 1-21 at 18–19.

defendants, and the three young men were thereafter arrested.[4] *Id.* at 228. A Grand Jury indicted Baker and his co-defendants on two counts of murder in the second degree;[5] manslaughter in the first degree; robbery in the first degree; two counts of robbery in the second degree; and robbery in the third degree. Doc. 1-8 at 9.

## B. Baker's State Court Proceedings

Patrick Bruno, Baker's trial attorney, was appointed to represent him in 2008. Doc. 1-16 ¶ 17. Dissatisfied with Bruno's representation, however, Baker mailed the court and the District Attorney's Office a *pro se* form Motion for Reassignment of Counsel in November 2008. Doc. 1-15 at 36–39. Among other things, Baker's form motion alleged the following:

> 6. This case has been pending for over [nine] months and my present attorney of record, Mr. P. L. Bruno, has also failed to:
>
> > a) Visit me at my place of confinement;
> > b) Inform me of any pertinent motion made, including bill of particulars, omnibus motion, suppression, etc, filed on my behalf;
> > c) Conduct an investigation in the matter of this action on my behalf;
> > d) Make any bail requests or reduction application on defendant's behalf.

*Id.* at 37. The record does not reflect that the trial court ever addressed or otherwise ruled on the motion.[6] *See* Doc. 2 at 15; *see also* Doc. 17 at 51. The record does, however,

---

[4] Baker was seventeen years old at the time of his arrest. *See* Doc. 1-16 ¶ 4.

[5] In New York, felony murder is one of various types of second-degree murder. N.Y. Penal Law § 125.25(3); *Bethea v. Scully*, 834 F.2d 257, 258 (2d Cir. 1987). Baker was convicted under this theory. Doc. 1-21 at 400.

[6] In a 2013 affidavit in support of his state habeas petitions, Baker provided more context for the circumstances that led to his reassignment motion. *See* Doc. 1-16. He asserted that he first met Bruno in 2008 via videoconference. Doc. 1-16 ¶ 17. According to Baker, the conversation "lasted about fifteen minutes," and Bruno told Baker that he could be found guilty of felony murder. *Id.* Additionally, "Mr. Bruno explained the possibility of a plea deal, and he told [Baker] that he might be able to get a sentence of 10 years for [Baker] through a plea agreement." *Id.* at ¶ 19. Baker claims, however, that Bruno's explanations were insubstantial and insufficient. *See generally id.* ¶¶ 17–26. Bruno apparently "did not explain the People's case against [Baker] or [his] chances at trial, and he did not tell [Baker] what the minimum or maximum sentences were for felony murder in New York." *Id.* ¶ 19. At the end of the conversation, Baker told Bruno that he would not take the plea deal. *See id.* Baker's affidavit further asserted that Bruno failed to explain the evidence in the case, visit Baker in jail, answer Baker's phone calls, discuss defense strategies, or properly investigate his case. *Id.* ¶¶ 20–26.

reflect that Baker nevertheless continued to participate in his case, meeting with Bruno on various occasions and also appearing with him in court at various pre-trial conferences. *See* Doc. 17 at 19, 51–52; Doc. 29 at 14–15; *see also* Doc. 1-16 ¶¶ 20–28.

During one of his pre-trial hearings in January 2010, the Government provided Baker with a plea offer.  Doc. 1-16 ¶ 27; Doc. 1-18 at 8–10.  The proposed plea afforded Baker a determinate fourteen-year jail sentence with five years of post-release supervision in exchange for a plea of guilty to a charge of manslaughter.  Doc. 1-18 at 10. When the court asked Bruno whether he had had an opportunity to speak with Baker about the offer, Bruno indicated the following:

> Yes, I have.  He rejected the offer.  My offer, likewise, a 14 year offer would have included and covered a pending robbery, which incidentally did not occur while my client was at liberty, but he's rejecting the offer.

*Id.* at 12.[7]  The hearing transcript does not reflect that Baker objected or otherwise challenged Bruno's contention in any way.  *See id.*  Nevertheless, Baker claims that this was the first time he heard of the plea offer, Bruno offered him no advice regarding the offer, and Bruno otherwise failed to confirm that Baker understood the nature of the options before him.  Doc. 2 at 15–16.  He thus argues that his decision to deny the offer was "neither knowing nor informed."  *Id.* at 16.

The state court held various additional pre-trial hearings that Baker discusses in the instant petition.[8]  On April 6, 2010, the Government moved for two protective orders in regard to three potential trial witnesses pursuant to New York Criminal Procedure Law ("C.P.L.") § 240.50.  *See* Doc. 1-20 at 15–16.  Specifically, the prosecution made two requests.  *First*, the prosecutor asked for leave to make an *ex parte* application to protect

---

[7] John Morabito, the prosecutor that tried Baker's case, indicated that Baker had the opportunity to discuss the plea offer with Baker "for approximately thirty minutes," after the prosecution team and the judge had exited the courtroom.  Doc. 17-1 ¶ 5.  While one of Baker's co-defendants, Warner, accepted the Government's plea offer, Baker and Allick elected to proceed to trial.  Doc. 1-8 at 9 n.1.

[8] Baker did not raise his counsel reassignment motion at any of these hearings.  *See generally* Doc. 1-16 ¶ 26.

the nature of the benefit that Barbara and Denise Coles were to receive for their testimony. *Id. Second*, the prosecutor asked for leave to make an *ex parte* application to protect the name of an additional potential witness, Osvaldo Vargas, unless and until Vargas testified at trial. *Id.* at 16, 23. In support of both requests, the prosecutor highlighted the legitimate needs of law enforcement and the fact that the three witnesses faced the possibility of physical harm. *See id.* at 16–26. Allick's attorney requested that the applications be made in the presence of the lawyers for all three defendants. *Id.* at 24. Bruno agreed to that request. *Id.* at 25.

The court directed that all counsel and the court reporter discuss the protective order requests outside the presence of the defendants. *Id.* at 26. It also indicated that the record in regard to the two protective orders would be sealed. *Id.* The court further noted that each attorney would be under a directive "not to disclose to his client until immediately before the involved witness testifies" the name of the witnesses subject to the proposed protective orders. *Id.*; *see also id.* at 31. The court granted the prosecution's applications for both protective orders. *Id.*

Baker and Allick's trial began on April 14, 2010, and the jury convicted Baker of second degree murder six days later.[9] Doc. 1-20 at 394–421; Doc. 1-22 at 123–30. The court adjourned Baker's case for sentencing, directed the probation department to prepare a presentence memorandum, and instructed the parties to file sentencing submissions.[10] *Id.* at 130.

The court sentenced Baker on May 12, 2010. Doc. 1-23 at 1. It asked the parties whether they had had an opportunity to review the Pre-Sentence Report ("PSR") filed by

---

[9] Warner pleaded guilty to Robbery in the First Degree and the state court sentenced him to eight years of imprisonment with five years of post-release supervision. Doc. 1-8 at 9 n.1. Allick and Baker were tried together. *Id.* Allick was convicted and sentenced to an indeterminate term of twenty-five years to life in prison. *Id.*

[10] The record does not clarify whether sentencing submissions were in fact filed ahead of Baker's sentencing hearing. *See* Doc. 1-23 at 1–14. Nor do the parties make note of any such memoranda.

the Department of Probation.  *Id.* at 3.  Bruno stated that he read the report, waived any

further delay, and he and Baker were both prepared to proceed.  *Id.*  Thereafter, the parties

proceeded to make their sentencing arguments as to both the murder conviction and

Baker's guilty plea as to an unrelated robbery offense.  Notably, Bruno and the prosecutor

both raised the fact that the PSR contained ambiguous or erroneous information.[11]  *See,*

*e.g.*, Doc. 1-23 at 3, 7–8.

In a brief statement regarding the murder conviction, the prosecutor asked for a

maximum sentence of twenty-five years to life in prison.  *Id.* at 4–5.  It cited "two

reasons" for its position:  first, "this defendant should be isolated from open society for as

long a period of time if he does not accept his responsibility, because he's a danger to the

community."  *Id.* at 4.  Second, he noted that "[t]he responsibility for the death of the

deceased is directly attributable to both defendants equally."  *Id.*  Bruno then had an

opportunity to address the court.  He stated the following:

> Your Honor, there is nothing I could add.  You were present for the jury
> trial, you obviously paid very careful attention.  I would be foolish to
> rehash any facts at this time.

*Id.* at 5.[12]  The court thereafter asked Baker whether he wished to make a statement.  *Id.*

Baker said, "Not at all."  *Id.*

---

[11] Baker contends that "Mr. Bruno never mentioned or specified, let alone corrected, any errors for the court."  Doc. 2 at 19.  The record shows otherwise.  *See* Doc. 1-23 at 8.  Bruno noted that "the probation report is confusing.  At one point it acknowledges [that a prior offense of Baker's is] a [Youthful Offender offense] and then [the Department of Probation] refers to him as a predicate felon."  *Id.*  In other words, Bruno corrected the misstatement in the PSR by noting that Baker's prior offense had indeed been treated as a Youthful Offender conviction.  *See id.*

[12] While Baker argues that Bruno should have drawn the Court toward his alleged lack of intent, mitigating factors, young age, and "deep remorse," Doc. 2 at 42, the Government contends that Bruno's "decisions were reasonable and strategic given the circumstances presented," Doc. 17 at 49; *see also id.* at 38.  Indeed, in an affidavit filed in opposition to Baker's motion to vacate his judgment under § 440.10, District Attorney Emily Anne Aldridge indicated that Bruno stated the following in a phone call:

> [Bruno] further explained that telling a judge about a defendant's difficult childhood
> backfires the vast majority of the time and does not mitigate killing.  He prefers to make
> brief records in front of sentencing judges so as not to "put the cart before the horse" for
> any future appeal.

Doc. 1-13 at 4.

In imposing Baker's sentence on his murder conviction, the court explained its reasoning and stated that:

> The credible evidence in this case established, beyond a reasonable doubt, in fact, beyond virtually any doubt whatsoever, that you, along with your co-defendants, robbed Mr. Ramos Luna in the early morning hours of October 6, 2007, that he was essentially helpless before, during and after the robbery, and that further, you assisted in the acts, which I agree with the prosecutor, were pointless, senseless, tragic, of throwing the victim down a flight of stairs, leading to his death.
>
> My task is to sentence you for this offense in a manner that takes into account the many functions that criminal sanctions are designed to advance, to find the appropriate balance that punishes you for your conduct, that gives the family and friends of Mr. Ramos, as well as the community at large, a right sense of justice, and if it helps, if at all, possibly to rehabilitate you.
>
> In doing this, I consider not only your past record, but note that you have not in any way, obviously prior to trial, but here today, weeks after the trial, accepted any responsibility for what you've done.  Without accepting responsibility for your conduct, it will be impossible for rehabilitation to begin.
>
> For these reasons, I now sentence you, upon your conviction of murder in the second degree, to an indeterminate term of incarceration in State prison, with a minimum of 20 years, a maximum of life in prison.

*Id.* at 5–6.  Bruno then noted that "I note that I will remain available should he exercise his right to appeal.  He's received a copy of those rights in writing." *Id.* at 6.

The court then heard the parties' arguments as to Baker's unrelated robbery charge. *Id.* at 6–7.  Bruno indicated that they "worked out a plea agreement." *Id.* at 7. He further stated that Baker wanted "to withdraw his previously entered not guilty plea and now enter a plea of guilty to violation of Penal Law section 160.10, robbery in the second degree," with the understanding that he would be sentenced to "a four-year determinate sentence to run concurrent with the sentence just given on the homicide." *Id.* at 9.  The court then asked Baker to confirm that that was, in fact, what he wanted to do. *Id.*  Baker affirmed that it was and that he had had enough time to speak with Bruno about the plea. *Id.*  The court also asked Baker a series of questions in order to confirm that he understood the nature of his plea. *Id.* at 10–11.  It then sentenced him to four years of

imprisonment and five years of post-release supervision on the robbery charge. *Id.* at 11–12.

Baker timely appealed his murder conviction; however, he did not immediately perfect his appeal.[13]  Doc. 1-11 at 2.  Indeed, while his appeal was still pending, Baker filed a C.P.L. § 440.10 motion to vacate his murder conviction on April 15, 2014.  *See* Doc. 1-14.  He alleged that Bruno provided ineffective assistance of counsel during plea bargaining and at sentencing.  Doc. 1-14 at 17, 28.  He also argued that Bruno failed to provide meaningful representation before trial, ahead of his plea hearing, during his trial, and at sentencing, *id.* at 11, 13, 14, and noted that his motion for new counsel was never heard, *id.* at 12.

Along with his motion, Baker attached an affidavit that provided information about his background and his account of Bruno's representation.  *See generally* Doc. 1-16.  Among other things, he alleged that Bruno did not investigate his case "or make any effort to understand the facts," failed to properly advise him about his plea offer and sentencing exposure, and did not properly advise him about making a statement at his sentencing hearing.  *Id.* ¶¶ 51–53; *see supra* note 6; *but see* Doc. 1-16 ¶ 19 (noting that Baker's affidavit stated that Bruno "explained the possibility of a plea deal, and he told [Baker] that he might be able to get a sentence of 10 years for [him] through a plea agreement").  Baker also claimed that Bruno failed to provide him with a copy of the PSR, and he emphasized that "Mr. Bruno made no argument on my behalf" at sentencing.  Doc. 1-16 ¶¶ 43–46.

Baker also attached to his § 440.10 motion an affirmation in support prepared by his new attorney, Katherine Marshall.  Doc. 1-15.  The affirmation discussed the relevant background and provided context for Baker's ineffective assistance arguments.  *See generally id.*  In the affirmation, attorney Marshall also stated the following:

---

[13] Baker did not perfect his appeal until it was consolidated with his appeal of the state court's decision regarding his subsequent C.P.L. § 440.10 motion to vacate his conviction.  Doc. 1-11 at 2; *see infra* note 15.

I spoke with Patrick Bruno on August 20, 2013.  Contrary to Mr. Baker's affidavit, Mr. Bruno claims that he properly advised Mr. Baker regarding his potential sentence exposure at trial and his plea offer.  Mr. Bruno provided no reason for his failure to advocate for Mr. Baker at sentencing other than Mr. Bruno's belief that his advocacy would not have resulted in a more favorable sentence.

*Id.* ¶ 39.

The government filed a response in opposition to Baker's § 440.10 motion and attached an affirmation from Assistant District Attorney ("ADA") Emily Anne Aldridge. Doc. 1-13; *see also supra* note 12.  The affirmation discussed the background of Baker's case leading up to his conviction and sentence.  Doc. 1-13 ¶¶ 1–7.  It also provided a detailed account of a conversation that ADA Aldridge had with Bruno in May of 2014. *Id.* ¶ 8.  Specifically, Aldridge noted the following:

On May 30, 2014, the undersigned had a telephone conversation with Mr. Bruno, a member of the 18-B Panel in Bronx County who was admitted to the bar in 1980.  He explained that he had advised defendant to accept a plea.  He explained the charges against defendant, including felony murder, and the sentencing exposure upon conviction.  According to Mr. Bruno, defendant was adamantly against taking any plea.  Mr. Bruno explained the evidence against defendant, but defendant believed that the video evidence of the crime was too foggy to definitively identify him. Mr. Bruno reminded him that there were two eyewitnesses who had known defendant for many years and were able to identify him. Defendant counted on the eyewitnesses not testifying.  Defendant claimed that the People did not have a strong case against him.  During the trial, defendant sat at the defense table grinning and making comments in the presence of the jury.  Mr. Bruno made several visits to the pens to speak with defendant, and advised him to "wipe the grin off his face" and "look repentant."  [ . . . ]  Regarding the sentencing, Mr. Bruno spoke with defendant before the sentencing, and they were able to agree to a plea to an unrelated robbery case.

*Id.*  ADA Aldridge further stated that Bruno mentioned that he preferred to make brief records in front of sentencing judges.  *Id.*; *see supra* note 12.

Baker's § 440.10 motion was denied in its entirety, without a hearing, in September 2014.  Doc. 1-11 at 2–11.  Notably, it was denied by the same judge that presided over Baker's trial and sentenced him.  *Compare id.* at 11 with Doc. 1-20 at 1; Doc. 1-23 at 1.  In its opinion, the court stated that, "viewing the evidence and circumstances of this case in totality, counsel provided defendant with meaningful

representation which did not fall outside the 'wide range of professionally competent assistance'" under *Strickland v. Washington*, 466 U.S. 668 (1984) and corresponding state caselaw.  Doc. 1-11 at 5.  It added that "counsel zealously and competently represented defendant," highlighting "familiarity of the case and the relevant principles of evidentiary, substantive, and procedural law," as well as Bruno's "vigorous[]" cross-examination of the Government's witnesses.  *Id.* at 5–6.

The court specifically emphasized that Baker's allegations about Bruno's deficiencies at the plea stage were "completely belied by the hearing transcript."  *Id.* at 7.  And in regard to Baker's sentencing arguments, the court concluded that "there were no mitigating circumstances in the facts of the case," noting specifically that Bruno's failure to focus on Baker's "difficult upbringing would not have overcome [Baker's] refusal to accept responsibility, and the absence of any remorse on his part."  *Id.* at 10.  The court also clarified that Baker had the opportunity to speak on his own behalf, but he declined the opportunity to do so.  *Id.* at 9.

Finally, the court concluded by noting that "defendant's claim of ineffective assistance is devoid of any sworn allegations of fact to support such a claim. . . .  Here, defendant has not provided an affidavit from his attorney to corroborate defendant's version of events.  Nor has defendant provided an explanation for his failure to do so.  Absent an affidavit from such a potential witness, defendant's allegations are self-serving, unsubstantiated and fail to establish that counsel's performance was less than professional."  *Id.* at 10–11.[14]

Baker appealed the court's order denying his § 440.10 motion.[15]  *See People v. Baker*, 139 A.D.3d 591 (1st Dep't 2016).  He argued that he was improperly excluded

---

[14] Of note, Bruno passed away several months after the court denied Baker's § 440.10 motion.  *See* Doc. 26 14 n.15.

[15] Baker's appeal of the court's decision as to his § 440.10 motion was consolidated with the separate, unperfected appeal of his conviction originally filed on June 4, 2010.  *See supra* note 13.

from the pre-trial hearing regarding the Government's applications for various protective orders, denied his right to counsel when the trial court failed to address his *pro se* motion for the reassignment of counsel, and denied his constitutional right to effective assistance of counsel at the plea and sentencing stages. *See generally* Doc. 1-9. Baker also argued that the trial court erred when it denied his § 440.10 motion without holding a hearing. *Id.* at 55–59.

The Appellate Division affirmed the conviction and the trial court's denial of his § 440.10 motion in May 2016. *Baker*, 139 A.D.3d at 591. In regard to the hearing pertaining to the Government's protective order requests, the Appellate Division noted that Baker failed to show "that his presence would have been useful, and his various arguments about his ability to contribute [to that hearing were] unpersuasive." *Id.* It further concluded that Baker's interests in participating in that hearing were outweighed by "valid concerns for the witness' safety, underlying the need for defendant's exclusion." *Id.* (citation omitted).

Regarding Baker's motion for assignment of new counsel, the Appellate Division concluded that he abandoned the motion by "failing to call the court's attention to the fact that the existing motion remained unresolved." *Id.* at 591–92. It also stated that "[t]here [was] no indication in the record that the court was even aware that this document existed. In any event, the typical standard form motion did not contain the specific factual allegations of serious complaints about counsel necessary to trigger the court's obligation to make a minimal inquiry." *Id.* at 592.

Finally, the Appellate Division determined that Baker's ineffective assistance claims were without merit "under the state and federal standards." *Id.* (citations omitted). Considering Baker's arguments about counsel's ineffectiveness at the plea stage, the Appellate Division noted that Baker's affidavit was "inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit." *Id.* Additionally, "[w]ith regard to defendant's claim of ineffective assistance in

connection with sentencing, defendant, who received less than maximum sentence despite the heinous facts of the crime, has not shown that the additional steps he faults his counsel for omitting could have led to even greater leniency." *Id.*

Baker timely sought leave to appeal the Appellate Division's decision. Doc. 1-5 at 2–3. The New York Court of Appeals denied his application. Doc. 1-1 at 3.

### C. The Instant § 2254 Petition

Baker filed the *habeas corpus* petition now before the Court nearly two years later, on January 18, 2018. Doc. 1. He raised four grounds for relief, each of which he previously brought in state court: (1) he was denied his Sixth Amendment right to counsel when the state trial court failed to adjudicate his motion for new counsel; (2) he was denied his Sixth Amendment right to the effective assistance of counsel at the plea stage; (3) he was denied his Sixth Amendment right to effective assistance of counsel at sentencing; and (4) the trial court denied him his constitutional right to presence at a material pre-trial hearing. Doc. 2 at 9–55.

The Government filed a response in opposition on July 13, 2018. Doc. 17. Baker filed a reply on September 28, 2018. Doc. 22. Judge Aaron then issued the Report on November 25, 2019. Doc. 26. Thereafter, Baker filed his objections to the Report on December 20, 2019. Doc. 29. The Government responded on March 9, 2022, and Baker replied on March 25, 2022. Doc. 34; Doc. 37.

## II. STANDARD OF REVIEW

### A. AEDPA Review of the State Court Proceedings

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214, habeas petitions filed under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d)(1), (d)(2).  This deference is required under the AEDPA if the petitioner's claim "was adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); *see Bell v. Miller*, 500 F.3d 149, 154–55 (2d Cir. 2007).

"Th[e] statutory phrase ['clearly established Federal law, as determined by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  In order for a federal court to find that the state court's application of Supreme Court precedent was unreasonable, the decision must be objectively unreasonable rather than simply incorrect or erroneous.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The factual findings made by state courts are presumed to be correct under the AEDPA, and petitioner has the burden to rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Nelson v. Walker*, 121 F.3d 828, 833 n.4 (2d Cir. 1997).

Additionally, "[i]f a state court's prior denial of a claim rested on an adequate and independent state ground, a federal court may not consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus."  *Murray v. New York*, No. 13 Civ. 5212 (ER), 2019 WL 2502101, at *5 (S.D.N.Y. June 17, 2019) (citation omitted).  In "all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A procedural bar is "adequate" if it is "based on a rule that is 'firmly established and regularly followed' by the state in question."  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991).  Violation of firmly established rules is "[o]rdinarily . . . adequate to foreclose review of a federal claim."  *Lee v. Kemna*, 534 U.S. 362, 376 (2002).  However, there are

"exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."[16]  *Id.*

To demonstrate cause, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Such factors may include:  (a) interference by government officials making compliance impracticable; (b) situations in which the factual or legal basis for a claim was not reasonably available to counsel; and (c) ineffective assistance of counsel.  *See id.* at 488; *see also Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (quoting *Carrier*, 477 U.S. at 488).  A showing of prejudice requires a petitioner to demonstrate that failure to raise the claim previously had a substantial injurious effect on his case such that he was denied fundamental fairness.  *Reyes v. New York*, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).

### B.  Review of the Magistrate Judge's Report

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Parties may raise "written" objections to the report and recommendation "[w]ithin fourteen days after being served with a copy."  *Id.*; Fed. R. Civ. P. 72(b)(2).  A district court reviews *de novo* those portions of the Report and Recommendation to which timely and specific objections are made.  28 U.S.C.

---

[16] The Second Circuit has clarified that courts should consider three "guideposts" in determining whether a case fits within that "limited category":  "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.  *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 381–85.)  In so doing, the Second Circuit made clear that "these three factors were not presented as a 'test' for determining adequacy."  *Id.*

§ 636(b)(1)(C); *see also United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997). The district court may adopt those parts of the Report and Recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008) (citations omitted). The district court will also review the Report and Recommendation for clear error where a party's objections are "merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition." *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted); *see also Genao v. United States*, No. 08 Civ. 9313 (RO), 2011 WL 924202, at *1 (S.D.N.Y. Mar. 16, 2011) ("In the event a party's objections are conclusory or general, or simply reiterate original arguments, the district court reviews the [R & R] for clear error.").

### III.   BAKER'S OBJECTIONS

Baker objects to each of the conclusions set out in Judge Aaron's Report. *See generally* Doc. 29; *see also* Doc. 26. Specifically, Baker asserts that the Report erroneously concluded that: (1) with respect to Baker's claim of ineffective assistance of counsel at the plea stage, "the only question before [Judge Aaron] was whether the state court's factual determination regarding Mr. Bruno's conduct was reasonable"; (2) with respect to Baker's claim of ineffective assistance of counsel at the sentencing stage, "the state court properly applied *Strickland*"; (3) the state trial court's failure to address Baker's motion for new counsel did not deprive him of his Sixth Amendment rights; and (4) the state court did not violate Mr. Baker's right to be present at a material stage of trial. Doc. 29 at 6, 8, 12, 17. For the reasons stated below, the Court adopts each of the recommendations set out in the Report.

#### A.   Baker's *Strickland* Claims

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which

include entry of a plea of guilty, and sentencing." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal citations omitted). To succeed on a claim of ineffective assistance of counsel, a claimant must satisfy the two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> "Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he 'must show that counsel's performance was deficient,' so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' and (2) he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 690, 694); *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

Under the first prong of *Strickland*, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. The Court "must make 'every effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell*, 500 F.3d at 156 (quoting *Strickland*, 466 U.S. at 689). The convicted defendant is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and the court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Under the second prong of *Strickland*, the petitioner must establish prejudice. "To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome.'"  *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  To satisfy reasonable probability, "the defendant must show more than that the unprofessional performance merely had some conceivable effect . . . [;] however, a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted).

"In the plea bargain context, the petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances, or that there is a reasonable probability that he could have negotiated a [more favorable] plea . . . or that he would have litigated an available defense."  *Whyte v. United States*, No. 08 Crim. 1330 (VEC), 2015 WL 4660904, at *5 (S.D.N.Y. Aug. 6, 2015) (internal quotation marks and citations omitted); *see also Missouri v. Frye*, 566 U.S. 134, 147 (2012) ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.").  Courts must also "keep in mind that 'a defendant has no right to be offered a plea, nor a federal right that the judge accept it.'"  *Kovacs*, 744 F.3d at 51 (quoting *Frye*, 566 U.S. at 148–49).

### 1. Baker's Claim Regarding Ineffective Assistance of Counsel at the Plea Stage

With respect to Baker's claim of ineffective assistance of counsel at the plea stage, he argues that "the R & R erroneously determines . . . that Mr. Baker's arguments should be disregarded because the state court rejected the same allegations."  Doc. 29 at 6.  He focusses this argument on his contention that the Report does not sufficiently address both prongs of § 2254(d).  *Id.*

The Second Circuit has made clear that "failure to give any advice concerning acceptance of [a] plea bargain [is] below the standard of reasonable representation."  *Cullen v. United States*, 194 F.3d 401, 404 (2d. Cir. 1999).  "An attorney's failure to

communicate a plea offer to his client, or to advise his client adequately about the plea offer, may [also] constitute constitutionally deficient assistance." *Abraham v. Lee*, No. 13 Civ. 2525 (RWS), 2014 WL 3630876, at \*9 (S.D.N.Y. July 22, 2014) (citing *Cullen*, 194 F.3d at 404).  Where a defendant claims that he elected to reject an offer due to his attorney's alleged deficiencies, the defendant "must show that but for the ineffective advice of counsel there is a reasonable probability that . . . the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances, that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

In this case, Baker argues that "[t]he state appellate court's denial of Mr. Baker's claims of ineffective assistance of counsel at the plea-bargaining stage of his trial was contrary to and an unreasonable application of the Supreme Court's decision in *Strickland* and numerous decisions of this Circuit." Doc. 2 at 31.  He specifically states that "[s]hirking a thorough constitutional analysis, the First Department dismissed Mr. Baker's claim out of hand . . . .'" *Id.* at 32.

The Court adopts the Report's recommendation and denies this claim.  *See* Doc. 26 at 24–27.  The Appellate Division's opinion makes clear that it assessed Baker's case "under the state and federal standards" and concluded that the record did not support his contention that Bruno's assistance was deficient. *Baker*, 193 A.D.3d at 592 (quoting *People v. Benevento*, 91 N.Y.2d 708, 713–14 (1998) and *Strickland*, 466 U.S. at 668).  In support of that contention, the Appellate Division stated that Baker's affidavit, which contained his allegations regarding Bruno's purported deficiencies, "was inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit." *Id.*

Considering the record, including the trial transcripts and the various affidavits that have been filed in Baker's cases over the course of the last decade, it is clear that the Appellate Division's conclusion does not warrant relief under *either prong* of § 2254(d). Baker has failed to show that the Appellate Division's conclusion that Bruno's assistance was sufficiently effective was "contrary to, or involved an unreasonable application of, clearly established Federal law, as defined by the Supreme Court of the United States; or [] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

In support of his argument, Baker defers to the allegations set out in his 2014 affidavit—that Bruno failed to "convey basic, but essential, information regarding the plea offer." Doc. 2 at 34; *see also* Doc. 1-16. However, those assertions are belied by the record here. Baker's own affidavit states that Bruno "explained the possibility of a plea deal, and he told me that he might be able to get a sentence of 10 years for me through a plea agreement."[17] Doc. 1-16 ¶ 19. Furthermore, the attorney that represented Baker when he filed his 2014 § 440.10 motion filed affirmation stating that she spoke with Mr. Bruno, who said the following:

> Contrary to Mr. Baker's affidavit, Mr. Bruno claims that he properly advised Mr. Baker regarding his potential sentence exposure at trial and his plea offer.

Doc. 1-15 ¶ 39. And the Government provided an additional affidavit corroborating that version of events. After speaking with Bruno in 2014, ADA Aldridge affirmed that Bruno said "he had advised defendant to accept a plea." Doc. 1-13 ¶ 8. Aldridge added that

---

[17] In the same affidavit, Baker later stated that he and Bruno "did not discuss a possible plea agreement before the hearing or afterwards." Doc. 1-16 at ¶ 28. The Court emphasizes that Baker's claims about Bruno's deficiencies are not only undercut by his own statements, but by the subsequent statements of attorneys from both sides. Doc. 1-13 ¶ 8; Doc. 1-15 ¶ 39. Importantly, this record was before the Appellate Division when it concluded that Baker's contentions were "inconsistent with the trial record, self-contradictory, uncorroborated by any other evidence, and otherwise without merit." *Baker*, 193 A.D.3d at 592. Accordingly, the Court cannot conclude that its decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2).

Bruno said he "explained the charges against defendant, including felony murder, and the sentencing exposure upon conviction." *Id.* Importantly, Bruno stated that Baker "was adamantly against taking any plea," but Baker "believed that the video evidence of the crime was too foggy to identify him." *Id.* Bruno further told ADA Aldridge that he "reminded [Baker] that there were two eyewitnesses who had known defendant for many years and were able to identify him," but Baker "counted on the eyewitnesses not testifying." *Id.*

Accordingly, the Appellate Division's conclusion as to the constitutional effectiveness of Bruno's representation was not, in fact, contrary to the Supreme Court's decision in *Strickland*, or otherwise unreasonable. Taken together, the evidence in this case makes clear that his plea discussions were within the realm of reasonableness.[18] *Strickland*, 466 U.S. at 690. Critically, the Court "must make 'every effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell*, 500 F.3d at 156 (quoting *Strickland*, 466 U.S. at 689). That task is straightforward here.

Finally, to the extent that Baker continues to assert that Bruno failed to provide him with effective assistance at the plea stage, the Court agrees with Judge Aaron's

---

[18] Baker argues that his case presents "similar facts" to those set out in *Carrion v. Smith*, wherein a habeas petitioner rejected a plea offer and the court found that the petitioner met the first prong of *Strickland*. 644 F. Supp. 2d 452, 455–57 (S.D.N.Y. 2009), *aff'd*, 365 F. App'x 278 (2d Cir. 2010). There, the district court found credible the petitioner's testimony that his trial attorney failed to advise him of the sentencing exposure he faced were he convicted at trial and also failed to give him advice regarding the advisability of accepting the plea offer. *Id.* at 467. The facts in Baker's case are different. First, the record contains evidence that calls into question the credibility of the self-serving statements that Baker has made in his various challenges to his conviction. *See supra* note 17. Second, in this case, Baker's own words clarify that Bruno informed him he could be found guilty of felony murder at trial, Doc. 1-16 ¶ 17, explained to Baker that two eye-witnesses would be testifying against him, *id.* at ¶ 18, and also "explained the possibility of a plea deal," and "told [him] that he might be able to get a sentence of 10 years," as opposed to the possible exposure on a felony murder conviction, "through a plea agreement, *id.* at ¶ 19. Given Baker's own admissions regarding these aspects of Bruno's representation, his comparisons to *Carrion* are unavailing.

finding that Baker has failed to show "a reasonable probability" that he would have accepted the plea offer prior to trial but for Bruno's alleged deficient assistance. *Lafler*, 566 U.S. at 164; *see also* Doc. 26 at 26.  The record is replete with evidence showing that Baker was adamantly against taking a plea deal or accepting guilt in any way. *See, e.g.*, Doc. 1-13 at 3; Doc. 1-23 at 6; Doc. 17-1 ¶ 5.

For all of these reasons, the Court adopts Judge Aaron's recommendation and denies Baker's claim regarding Bruno's alleged ineffective assistance at the plea stage.

### 2.  *Baker's Claim Regarding Ineffective Assistance of Counsel at Sentencing*

Baker also objects to the R & R's conclusion as to his claim of ineffective assistance of counsel at the sentencing stage.  He argues that the R & R improperly (1) concluded that *Strickland*, rather than *United States v. Cronic*, 466 U.S. 648 (1984), applies to his case, and (2) determined that the Appellate Division did not unreasonably apply *Strickland*.  Doc. 29 at 8.

It is well settled that criminal defendants enjoy the right to the effective assistance of counsel at the sentencing stage. *Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Glover v. United States*, 531 U.S. 198, 200 (2001).  Ordinarily, claims regarding the deficiency of counsel at sentencing are subject to review under *Strickland*. *See Lafler*, 566 U.S. at 165. *Strickland* requires petitioners to demonstrate that counsel was constitutionally deficient, and that deficient performance prejudiced the defense. *Bennett*, 663 F.3d at 84.

"In certain *rare* cases," Doc. 2 at 29 (emphasis added), however, where the circumstances of a case "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," *Cronic*, 466 U.S. at 658, a presumption of prejudice may be appropriate, *id.* at 660.  The Supreme Court has made clear that "[c]ircumstances of that magnitude" are unusual. *Id.* at 659.  Indeed, it noted that such circumstances "may be present on some occasions when . . . the likelihood that any lawyer, even a fully competent one, could provide effective assistance is *so small* that a

presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 650–60 (emphasis added).

The Court agrees with Judge Aaron's conclusion that the *Cronic* presumption does not apply here, and it adopts the R & R's recommendation as to Baker's claim regarding ineffective assistance at sentencing.

First, contrary to Baker's contentions, the R & R appropriately concluded that the circumstances of his case did not warrant a presumption of prejudice. Doc. 26 at 28. In *Cronic*, the Supreme Court provided examples of the types of situations that warrant such a presumption—situations that are easily distinguished from Bruno's alleged deficiencies. Notably, the *Cronic* Court used *Powell v. Alabama*—a Sixth Amendment case stemming from the 1932 rape convictions of various young, Black men in Alabama state court—as the prototypical example of such prejudice. *Cronic*, 466 U.S. at 660 (discussing the facts of *Powell v. Alabama*, 287 U.S. 45 (1932)). To illustrate the nature of cases where the presumption of prejudice should be made, the Court provided the following context about *Powell*:

> The defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed "all the members of the bar" for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." *Id.* 287 U.S., at 56. On the day of trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The problem was resolved when the court decided that the Tennessee lawyer would represent the defendants, with whatever help the local bar could provide.

> "The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them." *Id.* at 57–58.

> This Court held that "such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard." *Id.* at 53. The Court did not

examine the actual performance of counsel at trial, but instead concluded
that under these circumstances the likelihood that counsel could have
performed as an effective adversary was so remote as to have made the
trial inherently unfair.  Powell was thus a case in which the surrounding
circumstances made it so unlikely that any lawyer could provide effective
assistance that ineffectiveness was properly presumed without inquiry into
actual performance at trial.

*Cronic*, 466 U.S. at 660–61 (footnotes omitted).

Here, Baker failed to raise circumstances rising to that magnitude.  The record
does not support a conclusion that Baker "was denied the presence of counsel" at
sentencing.[19]  *Id.* at 662.  Nor does it support the conclusion that "there was a breakdown
in the adversarial process that would justify a presumption that [Baker's] conviction was
insufficiently reliable to satisfy the Constitution."  *Id.*  To be sure, Bruno provided a very
short statement at Baker's sentencing hearing.  Doc. 1-23 at 5.  However, Bruno stated
that he did so for strategic reasons, to avoid putting the "cart before the horse."  Doc. 1-
13 at 4.  Critically, the mere short length of an attorney's statement at sentencing cannot
automatically render that counsel's assistance presumptively ineffective.  Such a rule
would be contrary to the "strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance" that courts must apply when reviewing
*habeas corpus* cases.  *Bell*, 500 F.3d at 156.

With this context established, the Court also agrees with the R & R's
determination that the Appellate Division did not unreasonably apply *Strickland*.  Doc. 26
at 28–30.  In its opinion, the Appellate Decision noted that "defendant, who received a
less than maximum sentence despite the heinous facts of his crime, has not shown that the

[19] Baker's reliance on the Seventh Circuit's opinion in *Miller v. Martin* is misplaced. 481 F.3d 468 (7th Cir.
2007) (*per curiam*).  In *Miller*, the petitioner "was convicted *in absentia* after failing to appear for trial,
attended his own sentencing hearing but remained silent throughout the proceedings on the advice of his
attorney," and the attorney "likewise refused to participate" at sentencing hearing.  *Id.* at 470.  The Seventh
Circuit concluded that the *Cronic* presumption of prejudice applied to Miller's case because his attorney's
"advocacy at sentencing was so non-existent as to fall within even a very narrow exception."  *Id.* at 473.
Indeed, it emphasized that, in the attorney's own words, he "did nothing."  *Id.*  As discussed herein, Bruno
participated in Baker's sentencing hearing by noting errors in the PSR, asserting that one of Bruno's prior
offenses qualified as Youthful Offender conviction, and otherwise participating in discussions about Baker's
guilty plea on an unrelated robbery charge.  Doc. 1-23 at 1–8.  Accordingly, *Miller* does not support
Baker's arguments about the application of the *Cronic* presumption in his case.  *See* Doc. 29 at 9–11.

23

additional steps he faults his counsel for omitting could have led to even greater leniency." *Baker*, 139 A.D.3d at 592.  While Baker contends that Bruno failed to share the PSR with him and make various arguments at sentencing, he has not shown that the Appellate Division's judgment as to that representation was contrary to federal law as established by the Supreme Court or otherwise resulted on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

For all the reasons already discussed herein, the record does not support the conclusion that Bruno's performance was so deficient that it was outside the wide range of professionally competent assistance, nor that it produced a result that would have been different absent his purported deficiencies.  *Bennett*, 663 F.3d at 84 (quoting *Strickland*, 466 U.S. at 687, 690, 694).  Critically, in its review of Baker's § 440.1 motion to vacate—which contained the exact same arguments about Bruno's purported deficiencies that are now before the Court—the sentencing judge stated that "there were no mitigating circumstances in the facts of the case" that Bruno could have highlighted to affect his sentence, noting specifically that Bruno's failure to focus on Baker's "difficult upbringing would not have overcome [his] refusal to accept responsibility, and the absence of any remorse on his part."  Doc. 1-11 at 10.

Additionally, as the R & R emphasizes, the sentencing judge "was well aware of the facts regarding the case against Baker and Baker's role in the crime."  Doc. 26 at 29.  Indeed, the trial judge noted that "[t]he credible evidence in this case established, beyond a reasonable doubt, in fact, beyond virtually any doubt whatsoever, that you, along with your co-defendants, robbed Mr. Ramos Luna in the early morning hours of October 6, 2007, that he was essentially helpless before, during and after the robbery, and that further, you assisted in the acts, which I agree with the prosecutor, were pointless, senseless, tragic, of throwing the victim down a flight of stairs, leading to his death."  Doc. 1-23 at 5.

Given these circumstances, the Appellate Division's conclusion that Baker received effective assistance at sentencing was neither an unreasonable application of federal law nor an unreasonable determination of the facts. *Strickland*, 466 U.S. at 690; *see also* 28 U.S.C. § 2254(d)(1)–(2). This claim is thus denied.

### B. Baker's Claim Regarding His *Pro Se* Motion for New Counsel

Baker further argues that Judge Aaron's report erroneously concluded that his Sixth Amendment claim regarding his unheard motion for new counsel is procedurally barred. Doc. 29 at 12. Specifically, Baker contends that the application of New York's abandonment rule is "exorbitant" in this case. *Id.* He also emphasizes his position that he established cause and actual prejudice to excuse any procedural default. *Id.* at 15. In response, the Government counters that the claim is indeed barred due to Baker's abandonment of the motion. Doc. 34 at 6. It further claims that Baker failed to make a showing of sufficient cause and prejudice. *Id.* at 6–7.

The Sixth Amendment, which applies to the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defence." U.S. Const. amend VI. "While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant *rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.*" *Wheat v. United States,* 486 U.S. 153, 159 (1988) (emphasis added). The Sixth Amendment also does not "guarantee[] a meaningful relationship between an accused and his counsel." *Morris v. Slappy,* 461 U.S. 1, 14 (1983) (internal quotation marks omitted). Thus, "[a] court need go no further than ensuring that each defendant has an 'effective advocate.'" *Allison v. Khahaifa*, No. 10 Civ. 3453 (KAM), 2011 WL 3298876, at *9 (E.D.N.Y. Aug. 1, 2011) (quoting *Wheat,* 486 U.S. at 160).

Additionally, as stated above, *habeas* petitions filed under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2); *see also* Doc. 17 at 60. And "[i]f a state court's prior denial of a claim rested on an adequate and independent state ground, a federal court *may not* consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus." *Murray*, 2019 WL 2502101, at *5 (emphasis added). However, "[t]he adequacy of state procedural bars to the assertion of federal questions is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotation marks and alteration omitted). Thus, courts "have an independent duty to scrutinize the application of state rules that bar [its] review of federal claims." *Id.* at 468.

In this case, the Court agrees with the R & R's conclusion that Baker's claim is procedurally barred, and Baker failed to meet his burden to overcome the default. First, the Court agrees that the Appellate Division's decision rested on an adequate and independent state ground. *Murray*, 2019 WL 2502101, at *5; *see also Garcia*, 188 F.3d at 77; Doc. 26 at 21. As Judge Aaron emphasizes in his report, "[a]bandonment is firmly established and regularly followed in New York." Doc. 26 at 21 (quoting *Jamison v. Griffin*, No. 15 Civ. 6716 (PKC) (AJP), 2016 WL 1698350, at *47 (S.D.N.Y. Apr. 27, 2016)). And federal courts have made clear that "[a]bandonment is an independent and adequate state procedural ground which ordinarily bars habeas review." *Pendergast v. Rivera*, No. 06 Civ. 5314 (BMC), 2011 WL 4899945, at *4 (E.D.N.Y. Oct. 13, 2011).

Second, because the Court concludes that the record fails to show "actual prejudice" as defined by the Supreme Court in *Murray v. Carrier*, it adopts the Report's recommendation that this claim should be denied. 477 U.S. at 494; *see also* Doc. 1-15 at

36–39.  Indeed, to meet his burden, Baker had to show that the error he raises "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Carrier*, 477 U.S. at 494 (internal citations and emphases omitted).

Baker has not met that burden here.  In his objections to the R & R, Baker stated the following in regard to actual prejudice:

> [T]he degree of actual prejudice resulting from the trial court's failure to address his motion, when viewed in the total context of the events at trial, [ . . . ], is clear:  Mr. Bruno remained on Mr. Baker's case, and his advocacy (or lack thereof) was so ineffective as (1) to waive Mr. Baker's constitutional right to be present at a protective order hearing . . . and (2) to effectively leave him without an advocate at the sentencing and plea stages . . . .

Doc. 29 at 16.

As a preliminary matter, Baker erroneously assumes that the state trial court would have necessarily granted his motion for the reassignment of counsel if it had taken the opportunity to adjudicate it.  *Id.*  To the contrary, the record is replete with evidence showing that the court believed that Bruno provided Baker with adequate and competent representation.  *See generally* Doc. 1-11; *see also* Doc. 1-18; Doc. 1-19; Doc. 1-20; Doc. 1-21; Doc. 1-22; Doc. 1-23.  Additionally, Baker's arguments require the presumption that (1) a new attorney would have made materially different advocacy decisions in regard to the Government's request for the pre-trial protective order hearing, plea negotiations, and sentencing argumentation, and (2) those advocacy decisions would have resulted in a different outcome for Baker.  *See* Doc. 29 at 16.  The record not only contains evidence contradicting Baker's characterization of Bruno's advocacy at each of those stages, but it also provides a basis for the conclusion that different advocacy decisions would not have resulted in a different outcome in this case.  *See* Doc. 1-11 at 10.

Accordingly, Baker failed to overcome the procedural bar here.  *Thompson*, 501 U.S. at 750.  The record does not support the conclusion that the trial court's failure to

address his motion for the reassignment of counsel resulted in actual prejudice or a fundamental miscarriage of justice considering the "total context of events at trial." *Id.*; *United States v. Frady*, 456 U.S. 152, 170 (1982); *Artuz*, 269 F.3d at 90 (concluding that to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent").

Baker insists that the application of New York's abandonment rule is "exorbitant" in this case. Doc. 29 at 12; *see Cotto*, 331 F.3d at 240 (listing the three considerations courts evaluate in determining whether a case presents "exceptional" circumstances  in which "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question") (quoting *Lee*, 534 U.S. at 376). The Court disagrees.  While the record does not clarify whether the trial judge relied on the abandonment rule when it failed to address Baker's motion, it certainly does not support the conclusion that "perfect compliance with the state rule would have changed the trial court's decision."  *Cotto*, 331 F.3d at 240.  In other words, for the reasons already stated herein, the record does not indicate that the court would have granted Baker's motion for new counsel had he properly raised it before proceeding with his case.  And while the specific circumstances of Baker's case—namely, Baker's young age and the fact that he filed the motion *pro se*—did not necessarily require perfect compliance with the rule, the record shows that Baker did not even substantially comply with the rule.  *Id.* Indeed, the record only shows that he mailed his motion to the prosecutor and the trial court; it does not show that Baker *ever* raised the motion again with the court, the prosecutor, or his attorney.  *See* Doc. 1-15 at 36–39; *see infra* note 20.

Critically, *Cotto* calls the court to weigh the state interest in a procedural rule against the unique circumstances of the case.  *Cotto*, 331 F.3d at 240.  Here, the state's interest in the application of the abandonment rule outweighs Baker's allegations.  He simply has not shown that this is an "exceptional" case in which the application of the rule is "exorbitant."  *Id.*  Indeed, despite the fact that "Baker was a 17-year-old charged

with felony murder, who filed a *pro se* motion for new counsel, indicating that his counsel . . . had failed him," the record shows that Baker's characterization of Bruno's assistance lacked credibility and was otherwise unsupported.  Doc. 29 at 14; *see* Doc. 1-11; *compare* Doc. 1-16 ¶ 19 *with* Doc. 1-16 ¶ 28.; Doc. 1-13 at 3; Doc. 1-15 at 13.  Accordingly, New York's abandonment rule was an adequate basis for denying Baker's claim as to his reassignment motion.  *See Garcia*, 188 F.3d at 77.

In addition to the adequacy of the procedural bar here, Baker has failed to point the Court toward *any* case showing that the Appellate Division "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [the Supreme Court's]."  *Taylor*, 529 U.S. at 405; Doc. 17 at 60; *see also* Doc. 2 at 25–30; Doc. 29 at 12–16; Doc. 37 at 5.  None of the cases upon which Baker relies align with the facts of his case.  *See Lewis v. McGinnis*, No. 904 Civ. 32, 2008 WL 833964 (N.D.N.Y. Mar. 27, 2008); *Lopez v. Graham*, No. 10 Civ. 468, 2012 WL 1865502 (E.D.N.Y. 2012); *McKee v. Harris*, 649 F.2d 927 (2d Cir. 1981).  Indeed, neither *Lewis*, *Lopez*, nor *McKee* raise a scenario wherein a criminal defendant mailed a form motion for the reassignment of counsel, failed to raise it before the trial judge or otherwise object in any way to his attorney's representation, continued to participate in his case without pause despite the unresolved motion, and later claimed that he had suffered from a constitutional violation through the trial court's failure to address or adjudicate the motion.  *See generally id.*

For example, *Lewis* deals with a scenario where a defendant's *pro se* motion to substitute counsel was denied without a hearing despite the fact that the defendant claimed that his attorney "would not let [him] testify."  *Lewis*, 2008 WL 833964, at *13–14.  The *Lewis* Court concluded that petitioner's Sixth Amendment rights were *not* violated because there was no indication that the defendant and his attorney were unable to communicate, and counsel had discussed plea offers with his client, filed pre-trial

motions, and prepared for trial. *Id.* at *14. Likewise in this case, besides Baker's self-serving allegations, the record does not indicate that he and Bruno were unable to communicate. And the record shows that Bruno advised Baker about a possible plea and otherwise prepared for and actively participated at trial. *See, e.g.*, Doc. 1-16 ¶ 19; Doc. 1-11 at 6.

*Lopez* similarly fails to support Baker's contention that the Appellate Division arrived at a conclusion contrary to clearly established law as determined by the Supreme Court.[20]  *See Taylor*, 529 U.S. at 405. In *Lopez*, the defendant filed a *pro se* motion for reassignment and later alleged that the trial court deprived him of his constitutional right to counsel by failing to give it proper consideration. *Lopez*, 2012 WL 1865502, at *5. The Appellate Division rejected Lopez's claim. *Id.* Reviewing his § 2254 petition, the district court concluded that the Appellate Division's conclusion was not contrary to federal law.[21] *Id.* at *5–6. It determined that the Appellate Division's determination was reasonable despite the fact that the Court was "troubled by the dismissive fashion in which [the trial judge] denied Lopez's motion—especially by her statement that reassignment was 'not going to happen' before she even heard the reasons for it . . . ." *Id.*

---

[20] Baker cites to *Lopez* for the proposition that the Appellate Division's conclusion that he abandoned his motion for new counsel was an unreasonable application of clearly established federal law. Doc. 27 at 2; *see also Lopez*, 2012 WL 1865502, at *7. In dicta, the district court in *Lopez* did state that "to the extent that the state court concluded that it did not need to resolve Lopez's motion prior to trial because Lopez had abandoned it, that determination was an unreasonable application of clearly established federal law." *Id.* However, the Court also pointed out that in that case, "[n]othing in the record suggests that Lopez knowingly abandoned his motion for reassignment, and *the fact that Lopez's defense counsel alerted the court to Lopez's motion during trial . . . suggests the contrary.*" *Id.* (citation omitted) (emphasis added). Here, on the other hand, the record shows that Baker never raised the issue of the unresolved motion, despite the various opportunities he was given to provide statements or object to Bruno's affirmations that he and Baker had had the opportunity to discuss various matters. *See supra* pp. 3–6. Importantly, *Lopez* is not a holding of the Supreme Court as of the time of the relevant state-court decision. *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005).

[21] The *Lopez* Court emphasized that "Lopez's August 2003 request for reassignment consisted primarily of a pre-typed form affidavit with three boxes checked off: that counsel failed to (1) "visit defendant at his place of confinement or have him produced at the Court for a consultation"; (2) "provide copies and inform defendant of any Motions filed, Responses, and Court's decisions thereto"; and (3) "forward me copy of any bill of particulars and or discovery in his/her possession." *Id.* at *8; *compare id.* with Doc. 1-15 at 36–39.

at *9.  Critically, the Court noted that "[e]ven if the trial court had failed to adequately inquire into Lopez's motion, that error would be harmless" because (1) "the grounds for reassignment given by Lopez *at the time* were 'insubstantial'" and (2) the record did not suggest that the alleged problems between Lopez and his counsel "prior to trial persisted during the trial itself or impaired counsel's effectiveness at trial."  *Id.* at 9–10 (quoting *United States v. John Doe No. 1*, 272 F.3d 116, 123 (2d Cir. 2001) (emphasis in original); *see also Baker*, 139 A.D.3d at 591.

McKee also fails to demonstrate that the Appellate Division arrived at a conclusion that was contrary to clearly established federal law in Baker's case.  In that case, the Second Circuit made clear that while courts "should inquire into the reasons for dissatisfaction" where a defendant "voices a 'seemingly substantial complaint about counsel,'" a trial judge's failure to do so may well amount to harmless error.  *McKee*, 649 F.2d at 933 (quoting *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972).  Here, the record calls into question whether Baker raised a "substantial" complaint about counsel.  Doc. 1-15 at 36–39 (attaching form motion for reassignment of counsel); *see Lopez*, 2012 WL 1865502, at *8.  And while the trial judge's failure to hear Baker's motion on the record may have been in error, the record supports the conclusion that it was harmless.  *See supra* p. 28.

The Court recognizes the importance of the allegations that Baker sets out in his arguments about his unaddressed motion for the reassignment of counsel.  However, for all these reasons, this claim is similarly denied.

**C.  Baker's Claim Regarding the Pre-Trial Protective Order Hearing**

Finally, Baker argues that the R & R "errs in its analysis of Mr. Baker's right-to-presence claim" by determining that the Appellate Division did not unreasonably apply clearly established federal law.  Doc. 29 at 17.  He specifically argues that the Report "erroneously concludes" that his presence at the hearing regarding the Government's applications for protective orders would not have been useful.  *See id.* at 17–18.  The

Government responds that the Appellate Division's conclusion was not contrary to clearly established law.  Doc. 34 at 7–8.

In regard to this claim, the Appellate Division stated the following:

> The court did not violate defendant's right to be present at a material stage of trial when it excluded him, but not his attorney, from a hearing regarding protective orders delaying certain discovery.  Defendant has not shown that his presence would have been useful, and his various arguments about his ability to contribute are unpersuasive.  In any event, any potential for input from defendant was outweighed by valid concerns for the witnesses' safety, underlying the need for defendant's exclusion (*see People v Frost*, 100 NY2d 129, 135 [2003]).

*Baker*, 139 A.D.3d at 591.

It is well settled that criminal defendants are "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  However, an excluded defendant's due process rights are not denied *ipso facto*. *See id.* at 745–46 ("We conclude that respondent's due process rights were not violated by his exclusion from the competency hearing in this case.  We emphasize, again, the particular nature of the competency hearing.  *No question* regarding the *substantive testimony* that the [witnesses] would have given during trial was asked at that hearing.") (emphasis added).  As the R & R notes, "the constitutional right to presence is 'rooted to a large extent in the Confrontation Clause of the Sixth Amendment,' and thus clearly encompasses situations in which a criminal defendant is confronting witnesses or evidence against him."  Doc. 25 at 31 (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)).  However, "there is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'"  *Cohen v. Senkowski*, 290 F.3d 485, 498 (2d. Cir. 2002) (quoting *Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97, 105–06 (1934)).

Here, the Appellate Division's conclusion was not unreasonable under either prong of 28 U.S.C. § 2254(d).  *See Baker*, 139 A.D.3d at 591.  Contrary to Baker's

contentions, the R & R did not "overlook" the fact that "knowledge of a material benefit—such as the Coles' housing benefit in exchange for their testimony" is "useful at trial." Doc. 29 at 18. The R & R clearly acknowledged the importance of that information when it recognized that "Baker was advised of the Coles' housing transfer before they testified and had an opportunity to discuss the issue with his counsel prior to their cross-examination." Doc. 26 at 32; *see also Baker*, 139 A.D.3d at 591 (noting that the court excluded Baker, "*but not his attorney*, from a hearing regarding protective orders") (emphasis added).

Nor has Baker shown how his presence at the hearing "could have led the court to reject the protective order," *or* how that decision was "critical" to the outcome of his case. Doc. 29 at 17; *see Stincer*, 482 U.S. at 745. To be clear, the hearing involved the Government's motion for two protective orders regarding three witnesses, given the safety concerns presented in regard to those witnesses. *See* Doc. 1-20 at 15–26. Critically, Baker learned about the identity of two of those three witnesses, Barbara and Denise Coles, *before* the hearing, and he also heard that the two of them would be receiving a benefit in exchange for their testimony. *Id.* at 15. What he did *not* hear was the exact benefit, which was discussed outside of his presence. *Id.* at 15. As noted above, the court directed all counsel and the court reporter to discuss the protective order requests outside the presence of the defendants. *Id.* at 27–29. During the hearing, the court heard the prosecutor's concerns about the safety of Barbara and Denise Coles, as well as Osvaldo Vargas, the third witness that was not identified in front of Baker. *Id.* at 27–31. However, the prosecutor added Vargas to the witness list, in Baker's presence, the following day. *Id.* at 65.

Baker's contentions that his "personal knowledge could have led the court to reject the protective order," and that his "exclusion [thus] prevented him from offering information to counsel that could have assisted in cross-examination" are both unsupported and meritless. Doc. 29 at 18, 19. He simply does not show how his

purported knowledge of the motive of Barbara and Denise Coles to lie would have had an effect on the judge's decision to grant the protective orders, particularly where the prosecutor provided a lengthy allocution about the threats that the witnesses had received in regard to their anticipated testimony. *Compare id.* at 17 *with* Doc. 1-20 at 27–29. He also fails to show how he was prevented from "offering information that could have assisted in cross-examination" given that he knew about the identity of Barbara and Denise Coles, the prosecution's intention to call them as witnesses, and the fact that they would be receiving a benefit for their testimony *before* the hearing took place. Doc. 1-20 at 15. The same reasoning applies to Vargas given that Baker found out about his identity the day after the hearing. *Id.* at 65.

Baker's arguments about the possible benefits of his presence at the pre-trial hearing are thus unavailing. The hearing did not consider or focus on the substantive testimony that the three witnesses would provide. *Stincer*, 482 U.S. at 745–46. Nor did Baker's exclusion prevent him or his attorney from preparing for trial. Baker and Bruno both knew that Barbara and Denise Coles would be receiving a benefit in regard to their testimony *before* the hearing took place; Bruno learned about Vargas' identity during the hearing; and Baker learned about Vargas' identity shortly thereafter, when the prosecutor stated it on the record the following day before opening arguments, and well before Vargas could testify.[22] *See* Doc. 1-20 at 16–31, 65.

For all these reasons, the Court agrees with Judge Aaron's § 2254(d) analysis regarding Baker's right to be present at the protective order hearing. Doc. 26 at 32. Baker's claim is thus denied.

## IV.   CONCLUSION

For the reasons set forth above, the Court adopts Magistrate Judge Aaron's Report in its entirety and Baker's petition for a writ of *habeas corpus* is DENIED. The Clerk of

---

[22] Vargas ultimately did not testify at Baker's trial. *See generally* Doc. 1-20; Doc. 1-21; Doc. 1-22; *see also* Doc. 26 at 7.

# SPA35

Court is respectfully directed to close this case.  As Baker has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *see also, e.g., Matthews v. United States*, 682 F.3d 180, 185 (2d Cir. 2012).

It is SO ORDERED.

Dated:   December 13, 2022
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

35