# 23-46-PR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



SEAN BAKER,

*Petitioner-Appellant,*

*v.*

JAMES CONWAY,

*Respondent-Appellee.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## REPLY BRIEF FOR PETITIONER-APPELLANT

Kyle Victor
HANGLEY ARONCHICK SEGAL
   PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
215-568-6200

Amelia T.R. Starr
Yona A. Kornsgold
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

David Bernstein
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, New York 10007
212-402-4141

*Attorneys for Petitioner-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................3

    I.   *STRICKLAND*'S FIRST PRONG IS SATISFIED BECAUSE
        MR. BRUNO'S DECISION TO DO NOTHING AT
        MR. BAKER'S SENTENCING WAS NOT STRATEGIC ........................3

    II.  *STRICKLAND*'S SECOND PRONG IS SATISFIED
        BECAUSE PREJUDICE IS PRESUMED UNDER
        *CRONIC* ..........................................................................14

    III. ALTERNATIVELY, *STRICKLAND*'S SECOND PRONG
        IS SATISFIED BECAUSE PREJUDICE IS READILY
        DEMONSTRATED .........................................................................21

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrus v. Texas*,
140 S. Ct. 1875 (2020) ........................................................................6

*Bell v. Cone*,
535 U.S. 685 (2002) ...................................................................*passim*

*Bell v. Miller*,
500 F.3d 149 (2d Cir. 2007) ..............................................................10

*Burger v. Kemp*,
483 U.S. 776 (1987) ...........................................................................20

*Darden v. Wainwright*,
477 U.S. 168 (1986) ...........................................................................20

*Florida v. Nixon*,
543 U.S. 175 (2003) ......................................................................14, 20

*Gardiner v. Florida*,
430 U.S. 349 (1977) ...........................................................................16

*Garza v. Idaho*,
139 S. Ct. 738 (2019) ....................................................................14, 16

*Gonzalez v. United States*,
722 F.3d 118 (2d Cir. 2013) ................................................................4

*Kimmelman v. Morrison*,
477 U.S. 365 (1986) ......................................................................10, 13

*Lafler v. Cooper*,
566 U.S. 156 (2012) ........................................................................3, 16

*Lewis v. Zatecky*,
993 F.3d 994 (7th Cir. 2021), *cert. denied sub nom.*
*Reagle v. Lewis*, 142 S. Ct. 897 (2022) ...................................9, 16, 17

*McInerny v. Puckett*,
   919 F.2d 350 (5th Cir. 1990) ...............................................................19

*Mempa v. Rhay*,
   389 U.S. 128 (1967)............................................................................16

*Miller v. Martin*,
   481 F.3d 468 (7th Cir. 2007) ...............................................3, 4, 10, 17

*Norde v. Keane*,
   294 F.3d 401 (2d Cir. 2002) ................................................................14

*Phillips v. White*,
   851 F.3d 567 (6th Cir. 2017) ..............................................................17

*Powell v. Alabama*,
   287 U.S. 45 (1932).................................................................19, 20, 21

*Smith v. Brown*,
   764 F.3d 790 (7th Cir. 2014) ..............................................................18

*Strickland v. Washington*,
   466 U.S. 668 (1984)....................................................................*passim*

*United States v. Cronic*,
   466 U.S. 648 (1984)....................................................................*passim*

*United States v. Gooding*,
   594 Fed. App'x 123 (4th Cir. 2014) ....................................................11

*United States v. Gordon*,
   156 F.3d 376 (2d Cir. 1998) ................................................................25

*United States v. Reiter*,
   897 F.2d 639 (2d Cir. 1990) ................................................................19

*United States v. Theodore*,
   468 F.3d 52 (1st Cir. 2006)..................................................................18

*United States v. Wellington*,
   417 F.3d 284 (2d Cir. 2005) .......................................................3, 4, 14

*Wiggins v. Smith*,
    539 U.S. 510 (2003)......................................................................6, 12

*Williams v. Taylor*,
    529 U.S. 363 (2000)...........................................................................15

*Wilson v. Sellers*,
    138 S. Ct. 1188 (2018)......................................................................17

*Woods v. Donald*,
    575 U.S. 312 (2015).....................................................................17, 18

*Wright v. Van Patten*,
    552 U.S. 120 (2008)..........................................................................17

## Statutes

28 U.S.C. § 2254 ...............................................................................2, 27

N.Y.C.P.L. § 440................................................................22, 23, 24, 25

## INTRODUCTION

"Your Honor, there is nothing I could add. You were present for the jury trial, you obviously paid very careful attention. I would be foolish to rehash any facts at this time." J.A. 652 (Sentencing Tr. 5).

Those three sentences were the only advocacy that Attorney Patrick Bruno offered on behalf of his client Sean Baker at the latter's sentencing for murder. Nothing more. Never mind that Mr. Baker committed the underlying offense as a minor. Never mind that Mr. Baker had a difficult upbringing, a fact which was downplayed and mischaracterized in the Pre-Sentence Investigation Report (the "PSR"). Never mind that the crime was really a mugging gone awry—which resulted in Mr. Baker's conviction for murder only because of the simultaneous application of two expansive liability doctrines, the felony-murder rule and the "acting-in-concert" principle. And never mind that Mr. Baker in fact felt remorse for his role in the offense, even though he did not understand (and Mr. Bruno had not explained) how he could be guilty of murder on these facts. Never mind any of this—Mr. Bruno simply had "nothing" to say.

Moments after Mr. Bruno declined "to rehash any facts," the court sentenced Mr. Baker to an indeterminate period of twenty years to life in prison, a sentence five years above the statutory minimum of fifteen years to life. In explaining its sentence, the court made two misstatements of fact, first overstating Mr. Baker's

role in the offense and then understating Mr. Baker's degree of remorse. Both errors went uncorrected by Mr. Bruno. And as a direct result of Mr. Bruno's deficient representation, Mr. Baker remains incarcerated today, and he must wait five more years before he is first eligible for parole.

If this is not ineffective assistance of counsel, then nothing is. Respondent attempts to portray Mr. Bruno's actions at sentencing as part of a broader strategy, but this strategy is nowhere apparent in the record. And the strategy that Respondent invents is, in fact, contrary to the record and to common sense. Respondent also argues that Mr. Baker suffered no prejudice as a result of Mr. Bruno's errors—*i.e.*, that Mr. Baker would have received the same sentence anyway. But this also represents empty speculation on Respondent's part, speculation which is, moreover, contrary to clearly established law and to the evidence in the record.

For the following reasons, as well as the reasons previously set forth in Mr. Baker's opening brief, this Court should grant his 28 U.S.C. § 2254 habeas petition, vacate his sentence, and allow him a fair resentencing with the benefit of adequate counsel.

## ARGUMENT

I. **STRICKLAND'S FIRST PRONG IS SATISFIED BECAUSE MR. BRUNO'S DECISION TO DO NOTHING AT MR. BAKER'S SENTENCING WAS NOT STRATEGIC.**

It is telling that Respondent spills so much ink describing Mr. Bruno's "eloquent" representation of Mr. Baker at stages of the criminal proceeding other than sentencing. *E.g.*, Respondent's Brief ("Resp. Br.") 25, 29, 35. In fact—and although the record demonstrates that Mr. Bruno's prior performance was far from perfect—the effectiveness of that representation is entirely irrelevant to this appeal. As explained in Mr. Baker's opening brief, the *Strickland* analysis applies at each critical stage of a criminal proceeding independently—and sentencing is, indisputably, such a critical stage. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012). If anything, Respondent's emphasis on Mr. Bruno's performance at other stages serves only to underscore the fact that he "did nothing" at Mr. Baker's sentencing. *Miller v. Martin*, 481 F.3d 468, 471 (7th Cir. 2007).[1]

---

[1] Respondent selectively cites *United States v. Wellington*, 417 F.3d 284 (2d Cir. 2005), for the proposition that this Court should look to Mr. Bruno's representation during trial. Resp. Br. 46. Respondent's reliance on *Wellington* is misplaced. In *Wellington*, counsel made various concessions at trial "to preserve certain issues on appeal, including a speedy trial issue, without foreclosing the possibility of a sentence reduction for acceptance of responsibility." *Wellington*, 417 F.3d at 286–87 (internal quotation marks omitted). The catch, however, was that the defendant there *instructed* his counsel to take these steps. *Id.* at 288. Only in that specific context, bearing no relation to the facts here, did this Court analyze a *Strickland* issue by examining the attorney's conduct "in the context of the entire
(….continued)

In evaluating *Strickland*'s first prong, this Court need only look to Mr. Bruno's representation (or lack thereof) during and in preparation for Mr. Baker's sentencing proceeding on the felony murder charge. And, as detailed in Mr. Baker's opening brief, Petitioner's Brief ("Pet. Br.") 29–30, there can be no real dispute that Mr. Bruno "did little more than simply attend [Mr. Baker's] sentencing hearing," *Gonzalez v. United States*, 722 F.3d 118, 136 (2d Cir. 2013), a level of deficiency which this Court and other circuit courts have had no difficulty deeming constitutionally inadequate. *See, e.g.*, *Miller*, 481 F.3d at 471. First, Mr. Bruno made no advocacy on Mr. Baker's behalf, not even to rebut the prosecution's arguments; to emphasize Mr. Baker's limited role in the offense; to present mitigating evidence relating to Mr. Baker's youth, upbringing, and life circumstances; to correct prejudicial errors in the PSR; or to simply ask the court to impose a sentence less than the maximum. Pet. Br. 29–30. Indeed, Mr. Bruno's only comment at sentencing was, if anything, *harmful* to Mr. Baker: In response to the prosecution's pursuit of the maximum sentence, Mr. Bruno did not ask for a sentence less than the maximum, instead stating only, "there is nothing I could add" and that "I would be foolish to rehash any facts at this time." J.A. 652

---

proceeding," deciding that there was no ineffective assistance of counsel because counsel followed the defendant's instructions, even though counsel's performance in the absence of such instructions would have constituted error. *Id.*

4

(Sentencing Tr. 5). Second, Mr. Bruno did not even bother to investigate mitigating evidence before sentencing, leaving him unaware of facts that he could have used to argue persuasively for leniency. Pet. Br. 27–29. And Mr. Bruno compounded this mistake by neglecting to share the PSR with Mr. Baker or to discuss the contents of the report with him.[2] Pet. Br. 29. This left *Mr. Baker* unaware of Mr. Bruno's lack of knowledge, and similarly unaware of prejudicial errors and omissions in the PSR's recitation of his background and upbringing. Third, Mr. Bruno did not advise Mr. Baker that he had the right to make a statement on his own behalf at sentencing, nor did Mr. Bruno advise Mr. Baker that it would behoove him to express the remorse that he truly felt about his role in the offense.

Respondent attempts to justify these errors by asserting that Mr. Bruno "pursued a reasonably strategy." Resp. Br. 27. But the contention that Mr. Bruno had a strategy—let alone a reasonable one—is totally belied by the record and by logic. Mr. Bruno's "strategic decision . . . resembles more of a *post hoc* rationalization of counsel's conduct than an accurate description of [his]

---

[2] Respondent claims that Mr. Baker's recollection that Mr. Bruno never shared a copy of the PSR with him is "refuted by the record." Resp. Br. 29. But Respondent cites nothing in the record to support this conclusory statement. Instead, Respondent only notes that Mr. Bruno reviewed the PSR and discussed the PSR with *opposing counsel*. *Id.*

deliberations prior to sentencing." *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003) (internal quotation marks omitted); *see Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) (not crediting "counsel's purported strategy").

Respondent's effort to superimpose a strategic rationale on Mr. Bruno's deficient performance relies on a strained reading of Mr. Bruno's own words, recounted through an affidavit submitted by Emily Anne Aldridge, an attorney representing Respondent in the proceedings below (the "Aldridge Affidavit"). The Aldridge Affidavit recounts Mr. Bruno's purported strategy in all of three sentences:

> Regarding the sentencing, Mr. Bruno spoke with defendant before the sentencing, and they were able to agree to a plea to an unrelated robbery case. He further explained that telling a judge about a defendant's difficult childhood backfires the vast majority of the time and does not mitigate killing. He prefers to make brief records in front of sentencing judges so as not to "put the cart before the horse" for any future appeal.

J.A. 222. But evaluating these words with a modicum of common sense reveals that they do not actually describe any strategy at all.

As a threshold matter, Respondent relies heavily on the Aldridge Affidavit, which recounts a conversation between Ms. Aldridge and Mr. Bruno that took place more than four years after Mr. Baker's sentencing. Resp. Br. 10–11 (citing J.A. 221–22). Respondent omits, however, that the Aldridge Affidavit is not the only evidence in the record regarding Mr. Bruno's explanation of his "strategy" at

6

Mr. Baker's sentencing. The record also includes an affidavit of Katherine Marshall, Mr. Baker's attorney below, recounting a conversation with Mr. Bruno that took place some three months before Ms. Aldridge's conversation with Mr. Bruno. According to Ms. Marshall, "Mr. Bruno provided no reason for his failure to advocate for Mr. Baker at sentencing other than Mr. Bruno's belief that his advocacy would not have resulted in a more favorable sentence." J.A. 291.

In any event, even taking Mr. Bruno's words as recounted in the Aldridge Affidavit at face value, it is clear that Mr. Bruno was not pursuing any kind of strategy by remaining all but silent at Mr. Baker's sentencing. Respondent's arguments rely most heavily on the first sentence of the Aldridge Affidavit—the assertion that "Mr. Bruno spoke with defendant before the sentencing, and they were able to agree to a plea to an unrelated robbery case." J.A. 222. From these words, Respondent infers that Mr. Bruno deliberately chose not to present advocacy at Mr. Baker's murder sentencing as part of a strategy to minimize Mr. Baker's "ultimate total punishment," which "depend[ed] not only on the sentence for the murder but on whether he received a consecutive sentence for the unrelated robbery." Resp. Br. 27.

Mr. Bruno's actual words, however, do not say what Respondent claims they do. Instead, it appears from the language in question that Mr. Baker was prepared to plead guilty to the unrelated robbery charge regardless of what happened at the

murder sentencing. Nothing in Mr. Bruno's explanation, recounted through the

Aldridge Affidavit, suggests he believed that his non-existent advocacy at the

murder sentencing would lead to leniency at the unrelated robbery sentencing.

Moreover, Respondent's reasoning on its face makes little sense. Mr. Bruno

negotiated the plea with the prosecutor, not the court, and there is no indication

that this agreement was contingent on Mr. Baker receiving a specific sentence in

connection with the felony murder charge. In fact, prior to Mr. Baker's sentencing

on the felony murder charge, the prosecutor had already informed the sentencing

court that "[i]f [Mr. Baker] pleads guilty on the open robbery case, the People . . .

would ask the Court to consider and give him concurrent time." J.A. 652

(Sentencing Tr. 4). Nor is there any indication that the sentencing court would not

have imposed a concurrent sentence on the unrelated robbery charge had Mr.

Baker received a lesser sentence on the felony murder charge. Immediately after

sentencing Mr. Baker on the felony murder charge, the sentencing court first

indicated that it would adjourn the unrelated robbery charge for trial, and only

proceeded to address the robbery charge after counsel subsequently indicated that a

plea had been reached. J.A. 653 (Sentencing Tr. 6–7). This demonstrates that the

plea on the separate robbery charge played no role in the sentencing court's

imposition of the sentence on the felony murder charge. In other words,

Respondent's articulation of Mr. Bruno's purported strategy is simply unsupported by the record and by logic.[3]

Respondent's reliance on the remainder of Mr. Bruno's explanation, as recounted in the Aldridge Affidavit, is equally misplaced. The affidavit next states that Mr. Bruno "explained that telling a judge about a defendant's difficult childhood backfires the vast majority of the time and does not mitigate killing." J.A. 222. But the Court should not credit this as strategy. As Mr. Baker makes clear in his opening brief, Pet. Br. 33–34, Mr. Bruno could not have had made a strategic decision to not present mitigating evidence relating to Mr. Baker's youth and difficult upbringing at sentencing because Mr. Bruno failed even to investigate such evidence in the first place, and thus had no idea what evidence might exist. *See* Pet. Br. 34 (citing *Lewis v. Zatecky*, 993 F.3d 994, 1006 (7th Cir. 2021), *cert.*

---

[3] More fundamentally, any representation that Mr. Bruno offered Mr. Baker with respect to his sentencing on the unrelated robbery charge is simply irrelevant to the *Strickland* analysis of Mr. Bruno's performance at Mr. Baker's *felony murder* sentencing. The record makes clear, and Respondent acknowledges, that these were two *separate* criminal proceedings with two *separate* sentencings, notwithstanding their proximity in time. *See* Resp. Br. 34. As the record recounts, the sentencing court made clear that Mr. Baker was first "being arraigned for sentence on [his] conviction for murder in the second degree." J.A. 652 (Sentencing Tr. 3). And only after the court sentenced Mr. Baker in connection with the felony murder charge did it turn to the unrelated robbery charge. J.A. 653 (Sentencing Tr. 6). Indeed, as noted above, at the outset of the proceeding, the court did not even plan to discuss the unrelated robbery charge but to "adjourn[ it] for trial." *Id.*

*denied sub nom. Reagle v. Lewis*, 142 S. Ct. 897 (2022); *Miller*, 481 F.3d at 474;

and *Bell v. Miller*, 500 F.3d 149, 156–57 (2d Cir. 2007)); *Kimmelman v. Morrison*,

477 U.S. 365, 385 (1986) (holding that counsel's failure to file a timely motion

could not have been "due to strategic considerations" because counsel "had

conducted no pretrial discovery" and thus "was unapprised of the search and

seizure"); *see also Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("[C]ounsel

has a duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary.").

      Respondent similarly argues that Mr. Bruno was entitled to rely on the

PSR—both for its investigation of mitigating evidence relating to Mr. Baker's

upbringing and its presentation of such evidence to the sentencing court.[4] Resp. Br.

26–28. But again, Mr. Bruno's own words, recounted through the Aldridge

Affidavit, do not actually say that he relied on the PSR. Instead, Mr. Bruno merely

posited that submitting mitigating evidence "backfires the vast majority of the

---

[4] Respondent's brief states that certain information in the PSR about Mr. Baker's upbringing was "provided by" his sister. Resp. Br. 26–27. This misleadingly suggests that the Probation Officer who prepared Mr. Baker's PSR interviewed Mr. Baker's sister in connection with this sentencing. In fact, however, the face of the PSR confirms that the Probation Officer had rather pulled such information from a separate PSR prepared for Mr. Baker's sister in the course of her own criminal proceeding. J.A. 323. In other words, neither Mr. Bruno nor the Probation Officer ever interviewed Mr. Baker's family members as part of an investigation into his upbringing and life circumstances.

time," J.A. 222, an obviously insufficient explanation for his failure even to investigate such evidence.[5] Moreover, any reliance by Mr. Bruno on the PSR could not have been strategic because the PSR contains various errors and omissions—which Mr. Bruno should have noticed—both when recounting the facts of the offense (*e.g.*, the PSR twice says that Mr. Baker "caused the death of Ramiro Ramos-Luna," J.A. 322, 325[6]) and the facts of Mr. Baker's difficult upbringing and life circumstances. Not to mention that the PSR also contains obvious self-contradictions that should have put Mr. Bruno on notice of the other errors and omissions. The PSR states, for example, that Mr. Baker "resided in various shelters," "is the product of a broken home," "was discharged from school during the 11th grade due to his poor attendance," and that his father "provided no financial or moral support for the defendant"—all of which are true. But it

---

[5] As explained in Mr. Baker's opening brief, Pet. Br. 33, *United States v. Gooding*, 594 Fed. App'x 123 (4th Cir. 2014), is inapplicable here. Mr. Bruno commented that "there is nothing I could add *before* the sentencing judge made any comments to suggest that mitigating evidence would not be welcome.

[6] Respondent argues that the PSR was accurate in saying that Mr. Baker, "acting in concert with Kareem Walker [sic] and Michael Allick, caused the death of Ramiro Ramos-Luna." Rep. Br. 29 (quoting J.A. 322). Even if technically true as a matter of law that Mr. Baker "acted in concert" with his co-defendants when committing the offense, this factual description in the PSR nevertheless gives the impression that Mr. Baker's role in the offense was greater than it actually was, *i.e.*, that Mr. Baker actually committed the act that led to Mr. Luna's death. Of course, he did not. And, of course, Mr. Baker's lesser culpability and lack of intent to commit the murder were relevant at sentencing. *See* Pet. Br. 15.

11

simultaneously—and irreconcilably—concludes that Mr. Baker grew up in a

"moderately stable home environment." J.A. 324–25. No reasonable counsel would

have relied on this PSR to present a fair and accurate picture of a criminal

defendant to a sentencing court. *Cf. Wiggins*, 539 U.S. at 524, 527 (holding that

counsel's decision to review only the PSR and social service records "fell short" of

the first prong of *Strickland*).

None of these supposed strategies would, moreover, justify Mr. Bruno's

failure to advise Mr. Baker to make a statement on his own behalf at sentencing

expressing remorse. Faced with this devastating omission, Respondent wildly

speculates that Mr. Bruno advised Mr. Baker not to deny guilt at sentencing. Resp.

Br. 31. But Mr. Bruno never claimed that he did as much, and Respondent's

speculation is, moreover, contradicted by Mr. Baker's affidavit, J.A. 339–40,

which clearly recounts that Mr. Bruno never made him aware of his right to speak

at sentencing, nor of any purported strategy that Mr. Baker ought to remain silent.

No wonder Respondent has not made this assertion in any of the briefs it filed

below.[7] This Court should reject Respondent's new and speculative argument.

---

[7] Before the New York state courts, Respondent did not allege that Mr.
Bruno spoke to Mr. Baker prior to sentencing or advised him of a strategy. J.A.
111–12, 234. Instead, Respondent argued that Mr. Baker knew he would have the
opportunity to speak at sentencing because the court informed him of this at the
sentencing hearing. *Id.* In its briefing to the District Court, Respondent merely
(….continued)

In sum, Respondent's attempts to explain Mr. Bruno's performance at Mr. Baker's sentencing as part of a considered strategy all fall short. The theories advanced by Respondent as to what strategies Mr. Bruno might have been pursuing are inconsistent with Mr. Bruno's own explanation of his actions, as recounted in the Aldridge Affidavit.[8] And even on their own terms, Respondent's posited strategies are inconsistent with the record and with logic. Finally, even if specific aspects of Mr. Bruno's performance at Mr. Baker's murder sentencing might have been deliberate, the sum total is certainly not strategic: No reasonable counsel, representing a client convicted of murder, would decline to make a statement at sentencing, decline to present mitigating evidence without even investigating what such evidence there might be (relying instead on a facially self-contradictory PSR), and—perhaps most importantly—decline to advise his client to make a statement expressing remorse. *See Kimmelman*, 477 U.S. at 384 (*Strickland* requires not merely strategy but "*sound* strategy" (quoting *Strickland*, 466 U.S. at 689)

---

alleged that Mr. Baker "had a sufficient opportunity to confer with Mr. Bruno" prior to sentencing. J.A. 761.

[8] The final sentence of this explanation—that Mr. Bruno "prefers to make brief records in front of sentencing judges so as not to 'put the cart before the horse' for any future appeal," J.A. 222—is so nonsensical that Respondent does not even bother to cite this language. Of course, Mr. Bruno did not make even a "brief record" in front of the sentencing judge—he made no record at all. This explanation cannot possibly justify the sum total of Mr. Bruno's failures and omissions at Mr. Baker's sentencing. *See* Pet. Br. 35–36.

(emphasis added)). Respondent would have the Court believe that Mr. Bruno was playing three-dimensional chess. The far more compelling explanation is that he was ineffective.

## II. *STRICKLAND*'S SECOND PRONG IS SATISFIED BECAUSE PREJUDICE IS PRESUMED UNDER *CRONIC*.

For all the reasons recounted above and described in Mr. Baker's opening brief, Pet. Br. 37–45, Mr. Bruno "entirely fail[ed] to subject the prosecution's case at sentencing to meaningful adversarial testing," such that "the adversary process itself [became] presumptively unreliable." Pet. Br. 39 (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). Therefore, this Court must presume that Mr. Baker suffered *Strickland* prejudice.

In response, Respondent attempts to undermine *Cronic* by remarkably calling its key holding that prejudice must be presumed in certain circumstances "*dicta*." Resp. Br. 39–40. This fanciful proposition is belied by decades of precedent from the Supreme Court and this Court holding that *Strickland* prejudice is presumed when one of the criteria enumerated in *Cronic* is satisfied. *E.g.*, *Bell v. Cone*, 535 U.S. 685, 695–96 (2002); *Florida v. Nixon*, 543 U.S. 175, 186–87 (2003); *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019); *Wellington*, 417 F.3d at 287–88; *Norde v. Keane*, 294 F.3d 401, 413–14 (2d Cir. 2002).

Next, Respondent takes nearly three pages to describe the AEDPA standard, Resp. Br. 20–22. All this analysis does is underscore that the case at hand meets

this standard. Seeming to recognize as much, Respondent moves the goalposts in its discussion of the *Cronic* presumption. In its discussion of *Cronic*, Respondent asserts that "[p]etitioner does not point to any Supreme Court decision applying a presumption of prejudice under circumstances similar to those here." Resp. Br. 43. But that is plainly not the AEDPA standard. As Respondent itself correctly explains earlier in its brief, the AEDPA question is whether the state court unreasonably applied *Cronic*, and "[a] decision involves an 'unreasonable application' of Supreme Court precedent if it 'identifies the correct governing legal rule . . . but unreasonably applies it to the facts' of a particular case or 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Resp. Br. 20 (quoting *Williams v. Taylor*, 529 U.S. 363, 407 (2000)). In other words, it is not Mr. Baker's burden to identify a Supreme Court precedent that is on all fours with the facts here; rather, he need only identify precedent showing that the state court's refusal to apply *Cronic* here was unreasonable.

Here, as explained in Mr. Baker's opening brief, that precedent is *Cronic* itself and its progeny, most notably *Bell v. Cone*, 535 U.S. 685 (2002). First, the Supreme Court has made clear on numerous occasions that prejudice is presumed where counsel, although present, "entirely fails to subject the prosecution's case to

meaningful adversarial testing," such that "the adversary process itself [becomes] presumptively unreliable." Pet. Br. 38 (citing *Garza*, 139 S. Ct. at 744; *Bell*, 535 U.S. at 695–96; *Cronic*, 466 U.S. at 659–60). Second, Supreme Court precedent clearly establishes that this analysis, like the broader *Strickland* analysis, applies independently at each critical stage of the criminal proceeding—and that sentencing is one such critical stage. Pet. Br. 39 (citing *Bell*, 535 U.S. at 695–96; *Lafler*, 566 U.S. at 165; *Mempa v. Rhay*, 389 U.S. 128, 134 (1967)); *see also Gardiner v. Florida*, 430 U.S. 349, 358 (1977) ("[S]entencing is a critical stage of the criminal proceeding at which [the accused] is entitled to the effective assistance of counsel.").

Taking these two propositions together, it follows that the *Cronic* presumption applies when counsel entirely fails to subject the prosecution's case at sentencing to meaningful adversarial testing, such that the sentencing becomes presumptively unreliable. In *Bell*, the Supreme Court recognized this legal framework, although it declined to apply the *Cronic* presumption on the facts presented there. *Bell*, 535 U.S. at 697. Additionally, various circuit courts have applied the *Cronic* presumption of *Strickland* prejudice in this exact scenario— where counsel entirely fails to subject the prosecution's case at sentencing to meaningful adversarial testing—thus confirming that the law is sufficiently well established for purposes of AEDPA unreasonableness. *See, e.g.*, *Lewis*, 993 F.3d at

1005–06; *Miller*, 481 F.3d at 468; *Phillips v. White*, 851 F.3d 567, 581 (6th Cir. 2017). In *Lewis*, as here, counsel provided "literally no assistance" at sentencing. *Lewis*, 993 F.3d at 997. At sentencing, counsel "announce[d] . . . abandonment" when he told the judge that he was "going to defer to [the defendant] if he has any comments. I don't have anything to add." *Id.* at 1006. Mr. Bruno's statement at sentencing is strikingly similar. Respondent tries to distinguish *Lewis* by noting that counsel admitted that he failed to discuss the sentencing hearing with the defendant or prepare him for it. Resp. Br. 45. But as discussed above, Mr. Bruno failed to do the same.[9] Accordingly, just as it was unreasonable for the state court not to apply *Cronic* to the facts presented in *Lewis*, so too was it unreasonable for the state court not to apply *Cronic* here.[10]

_____

[9] It is irrelevant that Respondent disputes this fact, while respondent in *Lewis* did not. This Court can, and should, credit Mr. Baker's affidavit, which states that Mr. Bruno did not prepare him for sentencing or tell him that he would have the opportunity to speak at sentencing. J.A. 339; *see Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (noting that, in a habeas case, petitioner can show the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). Neither affidavit recounting conversations with Mr. Bruno states that he prepared Mr. Baker for sentencing or informed Mr. Baker of his purported strategy. J.A. 221–222, 291.

[10] *Wright v. Van Patten*, 552 U.S. 120 (2008), and *Woods v. Donald*, 575 U.S. 312 (2015), each cited by Respondent, Resp. Br. 43, are irrelevant. These cases involved completely novel factual circumstances where there was no Supreme Court precedent clearly establishing that *Cronic* applied under those facts. *Wright*, 552 U.S. at 126 (concerning a "novel factual context" where counsel appeared in a hearing by telephone instead of in person); *Woods*, 575 U.S. at 313 (finding that the Supreme Court had not addressed the "specific question" of
(….continued)

In response, Respondent claims that a court should consider whether counsel's failure to subject the prosecution's case to adversarial testing might have been part of a strategy to avoid "offend[ing] or inflam[ing] the court." Resp. Br. 43. But this is not the law, and this argument conflates the two prongs of *Strickland*. Indeed, neither of the cases Respondent cites supports this exception to the *Cronic* presumption. In *Smith v. Brown*, the Seventh Circuit held that the *Cronic* presumption did not apply because counsel did not "deny [defendant] of his representation *altogether*" at trial and because counsel "subject[ed] the state's case to *some* meaningful adversarial testing during his opening statement and his cross-examination of the victim." 764 F.3d 790, 798 (7th Cir. 2014) (internal quotation marks omitted) (emphasis added). Similarly, in *United States v. Theodore*, the First Circuit concluded that prejudice could not be presumed because counsel's performance at trial "was not tantamount to non-representation." 468 F.3d 52, 57 (1st Cir. 2006) (finding that counsel filed pre-trial motions, gave an opening statement, cross-examined witnesses, and introduced exhibits). In contrast, Mr.

---

whether counsel's brief absence during testimony concerning co-defendants qualifies as a critical stage). Here, for the reasons above, Supreme Court precedent clearly establishes that *Cronic* applies where counsel offers no advocacy during the entirety of a sentencing proceeding.

Bruno offered *no* representation to Mr. Baker at his sentencing on the felony

murder conviction.[11]

Respondent's citation to *Powell v. Alabama*, 287 U.S. 45 (1932), Resp. Br.

41–43, is misplaced for the same reason as the District Court's reliance on that

case was also misplaced, S.A. 22–23. As explained in Mr. Baker's opening brief,

Pet. Br. 44, the Supreme Court offered *Powell* as an example of *Cronic*'s third

category of ineffective assistance of counsel—a situation where, even though

counsel is present, "the likelihood that any lawyer, even a fully competent one,

could provide effective assistance is so small that a presumption of prejudice is

appropriate." *Cronic*, 466 U.S. at 659–60. Here, prejudice must be presumed under

*Cronic*'s second category—for "fail[ing] to subject the prosecution's case to

meaningful adversarial testing." *Id.* at 659. *Powell* is thus totally inapposite to this

case, as Mr. Baker has consistently argued.

---

[11] Similarly, in *McInerny v. Puckett*, 919 F.2d 350 (5th Cir. 1990), the court
found that *Cronic* did not apply because counsel's failure to test the prosecution's
case was not complete. The Fifth Circuit did, however, confirm the well-
established proposition that "no doubt a *total* lack of attorney preparedness
equivalent to *not testing* the prosecution's case at all might be tantamount to no
counsel." *Id.* at 353. And in *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir.
1990), this Court declined to apply *Cronic* because counsel's performance was
only deficient "at times." Here, in contrast, Mr. Bruno's advocacy was totally
absent *throughout* the felony murder sentencing.

Respondent then cites a laundry list of other cases, all of which are similarly irrelevant. *See* Resp. Br. 41–43. *Nixon*, 543 U.S. at 186–87, for example, concerned the inverse of this case: where counsel did not present evidence during a trial for capital murder in order to focus on the penalty stage, and where the Supreme Court considered whether counsel needed defendant's express consent to pursue this strategy. While the Court declined to apply *Cronic* there, it took it as a given that counsel had *some* strategy, which counsel had communicated to his client. *Id.* at 181, 192. As discussed, Mr. Bruno had no strategy, and certainly communicated no strategy to Mr. Baker.[12] Additionally, in *Darden v. Wainwright*, 477 U.S. 168 (1986), cited by the Respondent, the petitioner did not even argue that the *Cronic* presumption applied. *See Brief of Petitioner* at 46–47, *Darden v. Wainwright*, 477 U.S. 168 (1986), 1985 WL 669179. In any event, the counsel in *Darden*, unlike Mr. Bruno, "engaged in extensive preparation" for sentencing. 477 U.S. at 184.[13]

---

[12] As a matter of common sense, it may make strategic sense to concede guilt where one's argument at trial may hurt the defendant at sentencing. But the inverse—not contesting the prosecution's recommendation of the maximum sentence, after a defendant has *already been convicted*—obviously does not follow.

[13] Neither *Darden*, 477 U.S. at 186–87, nor *Burger v. Kemp*, 483 U.S. 776, 794 (1987), evaluated the prejudice prong of *Strickland* because both found counsel's representation not to be deficient. As discussed in Mr. Baker's opening brief, the Supreme Court declined to presume prejudice in *Bell* because, unlike here, counsel's failure was not "complete." 535 U.S. at 697. And similar to *Powell*, (….continued)

For all these reasons, the state court was unreasonable in declining to apply the *Cronic* presumption on these facts, and none of Respondent's arguments to the contrary are persuasive.

## III. ALTERNATIVELY, *STRICKLAND*'S SECOND PRONG IS SATISFIED BECAUSE PREJUDICE IS READILY DEMONSTRATED.

Even if this Court determines that Mr. Bruno's inaction at sentencing does not amount to the constructive denial of counsel necessary to trigger *Cronic*, this case nevertheless satisfies the ordinary *Strickland* prejudice requirement. Respondent insists that Mr. Baker would have received the same sentence even if counsel had highlighted his limited role in the offense, his youth and life circumstances, and his remorse. But asserting this does not make it so. The state court unreasonably applied *Strickland* in declining to find prejudice, and Respondent's arguments to the contrary are unpersuasive.

First, Respondent insists that the sentencing court must have been aware of Mr. Baker's limited role in the offense, and, specifically, of the fact that it was Mr. Allick, not Mr. Baker, who threw the victim down the flight of stairs. Resp. Br. 37. The record suggests otherwise. At sentencing, the court stated that Mr. Baker

---

*Cronic* concerned the third category—whether a competent lawyer could have prepared to defend the case in a short time, not the second category Mr. Bruno's deficient performance falls into. *Cronic*, 466 U.S. at 663.

"assisted in the acts, which I agree with the prosecutor, were pointless, senseless, tragic, of throwing the victim down a flight of stairs, leading to his death." J.A. 652–53. Respondent attempts to spin this statement as accurate, because the trial testimony suggests that Mr. Baker participated in the mugging and then helped drag the victim towards the flight of stairs. But the sentencing court did not say that Mr. Baker assisted in the robbery or the dragging; it said that Mr. Baker assisted in *throwing* the victim down the flight of stairs, which he undoubtedly did not do. And the sentencing court's subsequent opinion denying Mr. Baker's N.Y. C.P.L. § 440 petition confirms this misunderstanding: In that opinion, the court inaccurately stated that *all three* defendants, including Mr. Baker, "dragged the victim to a stairwell and threw him down the stairs." J.A. 192. In the same opinion, the court endorsed the prosecutor's misleading argument that "the victim's death was attributable to both defendants [*i.e.*, Mr. Allick and Mr. Baker] equally," and the court stated that "[c]learly, there were no mitigating circumstances in the facts of the case." J.A. 198.

All this evidence demonstrates that Mr. Baker's sentence reflects the court's erroneous belief that he bore direct responsibility for causing Mr. Luna's death. Had Mr. Bruno corrected this misimpression, there is a reasonable probability that the sentence would have been lower. Contrary to Respondent's speculation, the fact that Mr. Baker's sentence is lower than Mr. Allick's is not inconsistent with

this conclusion. Although the sentencing court was correct that Mr. Allick was the most culpable defendant of the three, the statements above all suggest that the sentencing court nevertheless held an exaggerated view of Mr. Baker's culpability. Nor is there any merit to Respondent's argument that Mr. Baker's level of culpability was not relevant to a sentencing for felony murder, as opposed to intentional murder. A defendant's level of culpability for causing a victim's death is surely a relevant factor at sentencing even if intent to cause the death is not an element of the crime.

Second, the record supports the conclusion that Mr. Baker would have received a lower sentence had Mr. Bruno investigated and presented facts relating to Mr. Baker's youth and difficult life circumstances. Respondent argues that the sentencing court was already aware of such facts by reading the PSR. Resp. Br. 38. To the contrary, as noted above, the PSR inexplicably states that Mr. Baker grew up in a "moderately stable home environment." J.A. 325. Respondent also relies on the sentencing court's statement—in its opinion denying Mr. Baker's C.P.L. § 440 motion—that "focusing on [Mr. Baker's] difficult upbringing" would not have made a difference at sentencing. Resp. Br. 38; J.A. 198. But it is hard to place much weight on that statement when the sentencing court never received a full and accurate picture of Mr. Baker's background.

23

Third, and most importantly, Respondent is wrong to dismiss the evidence that Mr. Baker was experiencing remorse over the offense, and that he would have expressed this to the sentencing court had Mr. Bruno properly advised him. Resp. Br. 35–37. This is a crucial point, because the record makes clear that the sentencing court expressly relied on Mr. Baker's supposed lack of remorse in its decision to impose a sentence of twenty years to life. J.A. 653 (Sentencing Tr. 6) ("[Y]ou have not . . . accepted any responsibility for what you've done."); *see also* J.A. 198 (in C.P.L. § 440 opinion, noting "the absence of any remorse"). But Mr. Baker was feeling "regret and remorse . . . about the incident" at the time, and he would have said as much to the court had Mr. Bruno advised him that doing so would have helped his case. J.A. 341–42.

Respondent apparently hopes that this Court will discredit Mr. Baker's affidavit, but it provides no real reason to do so nor cites any evidence to the contrary.[14] This Court has previously held that a defendant's post-conviction statements should not be rejected out-of-hand in the habeas context—even if "self-serving"—especially where they are supported by other objective evidence in the

---

[14] The court that denied Mr. Baker's C.P.L. § 440 motion described Mr. Baker's affidavit as "self-serving" (which it is, in the literal sense) and noted the absence of a corroborating affidavit from Mr. Bruno, but the court did not make specific credibility findings as to Mr. Baker's allegations. J.A. 198–99. The First Department only considered the merits of Mr. Baker's affidavit as it relates to the plea-bargaining stage, not sentencing. J.A. 40–41.

record. *See United States v. Gordon*, 156 F.3d 376, 380–81 (2d Cir. 1998)

(granting habeas relief and rejecting the government's argument that the

defendant's affidavit should be discredited on the ground that it was "self-

serving"). Here, Mr. Baker's statements in his C.P.L. § 440 affidavit that Mr.

Bruno failed to advise him that he should make a statement on his behalf are

supported by the extensive objective evidence that Mr. Bruno seldom met with Mr.

Baker and repeatedly failed to advise him throughout the proceeding.[15] *See, e.g.*,

Pet. Br. 6–8. Indeed, Mr. Baker's version of events—that Mr. Bruno never advised

him that it would behoove him to make a statement on his own behalf—is not only

inherently believable but is in fact uncontradicted in the record, including by Mr.

Bruno's own words recounted in the Aldridge Affidavit. *See* J.A. 221–22. Whether

Mr. Bruno recognized that Mr. Baker was feeling remorse is irrelevant—as any

competent counsel would have advised their client that making a statement

expressing remorse could help their case at sentencing. Nor is it so hard to explain

Mr. Baker's denial of guilt in the PSR: He felt remorse over Mr. Luna's tragic

death, but he did not understand how he could be guilty of murder on the facts of

his case. Respondent says it "begs credulity" that a young, inexperienced defendant

---

[15] Nor does Respondent suggest what choice Mr. Baker had other than to cite his own affidavit, after his counsel entirely failed to develop a record at sentencing.

who had not even completed high school might not understand the finer points of the felony-murder rule,[16] Resp. Br. 36, but this only underscores that it is not Respondent's job to see the world through the eyes of someone in Mr. Baker's position. That is, rather, the job of the defense lawyer, a role that Mr. Bruno utterly failed to satisfy here.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Baker's 28 U.S.C. § 2254 habeas petition and vacate his sentence of twenty years to life imprisonment.

---

[16] It bears repeating that Mr. Baker's guilt on the murder charge depended not only on the application of the felony-murder rule *but also* on the simultaneous application of a second doctrine that further expanded liability, namely "acting-in-concert" liability. In an ordinary felony-murder case, the defendant causes a death without intending to do so but is nevertheless guilty of murder. Here, Mr. Baker *neither* caused Mr. Luna's death *nor* intended to do so, but he was nevertheless guilty of murder because of the actions of his accomplice, Mr. Allick. Whether and in what circumstances a defendant can be guilty of murder without satisfying either the *actus reus* or the *mens rea* for murder presents an interesting hypothetical for a law school exam. But the answer to that question would certainly not have been obvious to a young, indigent non-lawyer, and Respondent cannot seriously argue otherwise.

Dated:   New York, New York
          <u>November 8, 2023</u>

          Respectfully submitted,
          <u>*/s/ Amelia T.R. Starr*</u>
          Amelia T.R. Starr
          Yona A. Kornsgold
          Davis Polk & Wardwell LLP
          450 Lexington Avenue
          New York, NY 10017
          Telephone:   (212) 450-4000
          Facsimile:   (212) 701-5800
          amelia.starr@davispolk.com

          Kyle Victor
          Hangley Aronchick Segal Pudlin & Schiller
          One Logan Square
          27th Floor
          Philadelphia, PA 19103
          Telephone:   (215) 496-7096
          Facsimile:   (215) 568-0300
          kvictor@hangley.com

          David Bernstein
          Office of the Appellate Defender
          11 Park Place, 16th Floor
          New York, NY 10007
          dbernstein@oadnyc.org

          *Attorneys for Sean Baker*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1. This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7)(B) and Local Rule 32.1(4) because this brief contains 6,727 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:    New York, New York
          <u>November 8, 2023</u>

                                   Respectfully submitted,
                                   */s/ Amelia T.R. Starr*
                                   Amelia T.R. Starr
                                   Davis Polk & Wardwell LLP
                                   450 Lexington Avenue
                                   New York, NY 10017
                                   Telephone:   (212) 450-4000
                                   Facsimile:   (212) 701-5800
                                   amelia.starr@davispolk.com


                                   *Attorneys for Sean Baker*